STATE of Minnesota, petitioner,
Appellant,

v.

Joshua Carl STONE, C9–96–1291, Cheryl Florine Graff, C0–96–1292, Kenneth Morgan Coleman, Jr., C2–96–1293, Charles William Zornes, C4–96–1294, Simon Dean Zornes, C6–96–1295, Margaret Mary Myhre, C8–96–1296, Voncille Marie Alvarado, CX–96–1297, Wendy Sue Littlewolf, C1–96–1298, Jamie Lynn Sargent, C3–96–1299, Respondents.

Nos. C9–96–1291, C0–96–1292, C2–96–1293, C4–96–1294, C6–96–1295, C8–96–1296, CX–96–1297, C1–96–1298, and C3–96–1299.

Supreme Court of Minnesota.

Dec. 11, 1997.

Eric O. Boe, Mahnomen County Atty., for appellant.

Zenas Baer & Associates, Zenas Baer, Hawley, for respondents Stone, Graff, Coleman, C. Zornes, S. Zornes, Myhre, Alvarado, and Sargent.

Hellerud & Larson, Regina A. Larson, Ada, for respondent Littlewolf.

Jacobson, Buffalo, Schoessler, & Magnuson, Steven G. Thorne, Joseph F. Halloran, Minneapolis, for amicus curiae Leech Lake Band of Chippewa Indians.

BlueDog, Olson & Small, P.L.L.P., Kurt V. BlueDog, Vanya S. Hogen–King, Greg Paulson, Minneapolis, for amicus curiae Shakopee Mdewakanton Sioux (Dakota) Community and Grand Portage Band of Chippewa.

## OPINION

KEITH, Chief Justice.

This case calls into question the state of Minnesota's jurisdiction to enforce certain traffic and driving-related laws against members of an Indian tribe within the boundaries of the tribe's reservation. The respondents, members of the White Earth Band of Chippewa Indians, were cited for the following violations within the boundaries of the White Earth Reservation: no motor vehicle insurance and no proof of insurance; driving with an expired registration; driving without a license; driving with an expired license; speeding; no seat belt; and failure to have child in a child restraint seat. The district court dismissed these charges for lack of jurisdiction.[1] The court of appeals affirmed, finding that the state lacked jurisdiction under Public Law 280 because the traffic and driving-related laws at issue were civil/regulatory rather than criminal/prohibitory. *State v. Stone,* 557 N.W.2d 588, 591–92 (Minn.App.1996). The court of appeals also

Hubert H. Humphrey III, Atty. Gen., Peter R. Marker, Asst. Atty. Gen., St. Paul,

---

1. Three of the respondents were also charged with violating Minn.Stat. § 171.27 (1996) (driving with a revoked license). However, the district court found that it had jurisdiction over this charge and found each of the respondents guilty. The court of appeals dismissed the respondents' pre-sentence appeals of the district court's findings as premature and therefore, the appeals are not included in this review.

found that the state lacked exceptional circumstances to justify enforcement of the laws without an express federal grant of jurisdiction. *Id.* at 593. We affirm.

## I

Each of the respondents in this consolidated case is a member of the White Earth Band of Chippewa Indians. Between August, 1995 and March, 1996, each of the nine respondents was charged with violating one or more of the following laws while within the boundaries of the White Earth Reservation:

1. Failure to provide motor vehicle insurance (Minn.Stat. § 169.797 (1996));

2. No proof of insurance (Minn.Stat. § 169.791 (1996));

3. Driving with an expired registration (Minn.Stat. § 168.09 (1996));

4. Driving without a license (Minn.Stat. § 171.02 (1996));

5. Driving with an expired driver's license (Minn.Stat. § 171.27 (1996));

6. Speeding (Minn.Stat. § 169.14 (1996));

7. Driving with no seat belt (Minn.Stat. § 169.686 (1996)); and

8. Failure to have child in a child restraint seat (Minn.Stat. § 169.685, subd. 5 (1996)).

The respondents stipulated that they would be guilty of the violations charged if the state had jurisdiction to enforce the traffic and driving-related laws against them.

The parties also stipulated to the inclusion in the record of the Reciprocity Agreement between the State of Minnesota and the White Earth Band of Chippewa Indians regarding the registration and insurance of vehicles and White Earth Band Ordinance No. 87–001 governing registration of vehicles. At the time that these citations were issued, the White Earth Band did not have a comprehensive set of traffic laws. However, in April 1996, the Band adopted a Motor Vehicle Code for the regulation of traffic and driving on the reservation.

## II

State court jurisdiction over matters involving Indians is governed by federal statute or case law. *Gavle v. Little Six, Inc.,* 555 N.W.2d 284, 289 (Minn.1996). The Supreme Court has consistently recognized that Indian tribes retain "attributes of sovereignty over both their members and their territory." *California v. Cabazon Band of Indians,* 480 U.S. 202, 207, 107 S.Ct. 1083, 1087, 94 L.Ed.2d 244 (1987) (citing *United States v. Mazurie,* 419 U.S. 544, 557, 95 S.Ct. 710, 717, 42 L.Ed.2d 706 (1975)). This sovereignty is "dependent on, and subordinate to, only the Federal Government, not the States." *Cabazon,* 480 U.S. at 207, 107 S.Ct. at 1087 (citing *Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 154, 100 S.Ct. 2069, 2081, 65 L.Ed.2d 10 (1980)). However, it is established that state laws may be applied to tribal Indians on their reservations if Congress has expressly so provided. *Cabazon,* 480 U.S. at 207, 107 S.Ct. at 1087.

Jurisdiction over Indian matters is a function of territory, subject matter, and race. *See* Felix S. Cohen, *Handbook of Federal Indian Law* 281 (1982 ed.). We note here that members of Indian tribes do not subject themselves to state jurisdiction over on-reservation conduct simply by maintaining a mailing address outside of their reservation. On this basis, we explicitly reverse *State v. Jackson,* 558 N.W.2d 752 (Minn.App. 1997), *pet. for rev. granted* (Minn. March 18, 1997).

In Public Law 280, Congress granted Minnesota broad criminal and limited civil jurisdiction over all Indian country within the state,[2] with the exception of Red Lake Reservation.[3] Pub.L. No. 83–280, 67 Stat. 588–89

---

2. The extent of Indian Country is defined at 18 U.S.C. § 1151 and it includes "all land within the limits of any Indian reservation under the jurisdiction of the United States Government ... and, including rights-of-way running through the reservation." *See DeCoteau v. District County Court,* 420 U.S. 425, 427, n. 2, 95 S.Ct. 1082, 1084, n. 2, 43 L.Ed.2d 300 (1975).

3. In 1973, the state retroceded all criminal jurisdiction for the Bois Forte Indian Reservation at Nett Lake back to the federal government under authority of 25 U.S.C. § 1323. Act of May 23, 1973, ch. 625, 1973 Minn. Laws 1500.

(1953) (codified as amended at 18 U.S.C. § 1162 (1994), 25 U.S.C. §§ 1321–24 (1994), 28 U.S.C. § 1360 (1994)). Section 2(a) of the Act provided Minnesota "jurisdiction over offenses committed by or against Indians * * * and the criminal laws of [the] State * * * shall have the same force and effect within such Indian country." Pub.L. No. 280 § 2(a), 67 Stat. 588 (1953) (codified as amended at 18 U.S.C. § 1162(a) (1994)). The purpose of this grant was to combat the problem of lawlessness on certain reservations and the lack of adequate tribal law enforcement. *Bryan v. Itasca County,* 426 U.S. 373, 379, 96 S.Ct. 2102, 2106, 48 L.Ed.2d 710 (1976). Section 4(a) grants Minnesota jurisdiction over private civil litigation involving reservation Indians and arising out of Indian country. Pub.L. No. 280 § 4(a), 67 Stat. 589 (1953) (codified as amended at 28 U.S.C. § 1360 (1994)). However, this section does not grant the state general civil regulatory authority. *Bryan,* 426 U.S. at 384–8, 96 S.Ct. at 2108–11.

▮ In order for a state law to be fully applicable to a reservation under the authority of Public Law 280, it must be a criminal law. *Cabazon,* 480 U.S. at 208, 107 S.Ct. at 1088. There is no bright-line rule which separates a criminal law from a civil law. *Id.* at 210, 107 S.Ct. at 1089. However, in *Cabazon,* the Supreme Court adopted the following test:

> [I]f the intent of a state law is generally to prohibit certain conduct, it falls within Pub.L. 280's grant of criminal jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub.L. 280 does not authorize its enforcement on an Indian reservation. The shorthand test is whether the conduct at issue violates the State's public policy.

*Id.* at 209, 107 S.Ct. at 1088. In *Cabazon,* the Supreme Court applied this test to determine whether a California gambling law, which limited the operation of bingo games to charitable organizations, constituted a criminal law under Public Law 280. *Id.* at 210–11, 107 S.Ct. at 1088–89. The Court relied on the state's sponsorship of a lottery and allowance for various kinds of gambling,

as well as the exceptions to the bingo statute, to find that California generally permits and regulates gambling, in general, and bingo, in particular. *Id.*

The *Cabazon* test admits of some ambiguity. The Supreme Court did not clearly state whether the "conduct at issue" to be analyzed is the broad conduct, such as gambling, or the narrow conduct, such as bingo. This distinction becomes crucial when the broad conduct is generally permitted, but the narrow conduct is generally prohibited, or vice versa. As a result of this ambiguity, there has been a split of authority among courts across the country, including the Minnesota court of appeals, regarding the application of the *Cabazon* test. Those courts which have interpreted "conduct" to refer to the broad activity have focused on this aspect without regard to the particularities of the narrow conduct. Those courts which have interpreted "conduct" to refer to the narrow activity have focused primarily on whether the narrow conduct is categorically prohibited or whether the statute controlling the conduct contains exceptions. *Compare State v. Johnson,* C5–96–1854, 1997 WL 104577 (Minn. App. March 11, 1997) (unpublished opinion)(laws regarding motor vehicle insurance, registration, driving after license revocation found to be regulatory) *with State v. Jackson,* 558 N.W.2d at 756 (dicta stating that proof of insurance law is criminal/prohibitory).

In this case, the appellant argues that the proper interpretation of the *Cabazon* test is to focus on the conduct prohibited by each individual traffic statute, while the respondents advocate examining the statutes together as part of the broad conduct of driving. However, a rigid application of either approach fails to yield a workable standard. If the broad conduct of driving is analyzed without any consideration of the nature of the specific traffic statutes, then virtually any traffic or driving-related statute would be considered civil, despite serious public policy concerns the specific statute may raise. Conversely, if each traffic statute is analyzed individually to determine if the narrow conduct is generally prohibited or permitted, practically every discrete aspect of a traffic

law could be classified as criminal for the purposes of Public Law 280. Fortunately, *Cabazon* does not require this court to adopt either of these approaches.

The *Cabazon* Court stated that the prohibitory/regulatory distinction was not a bright-line rule. *Id.* at 210, 107 S.Ct. at 1089. Rather, the Court noted, "The applicable state laws governing an activity must be examined in detail before they can be categorized as regulatory or prohibitory." *Cabazon*, 480 U.S. at 211, fn. 10, 107 S.Ct. at 1089 fn. 10. To achieve this comprehensive analysis and aid Minnesota courts in obtaining clear and consistent results, we adopt a two-step approach to applying the *Cabazon* test.[4]

The first step is to determine the focus of the *Cabazon* analysis. The broad conduct will be the focus of the test *unless* the narrow conduct presents substantially different or heightened public policy concerns. If this is the case, the narrow conduct must be analyzed apart from the broad conduct. After identifying the focus of the *Cabazon* test, the second step is to apply it. If the conduct is generally permitted, subject to exceptions, then the law controlling the conduct is civil/regulatory. If the conduct is generally prohibited, the law is criminal/prohibitory. In making this distinction in close cases, we are aided by *Cabazon's* "shorthand public policy test," which provides that conduct is criminal if it violates the state's public policy.

While this shorthand test is helpful, we note that all laws implicate some public policy.[5] Therefore, in light of the purpose of Public Law 280 to combat lawlessness, we interpret "public policy," as used in the *Cabazon* test, to mean public *criminal* policy. Public criminal policy goes beyond merely promoting the public welfare. It seeks to protect society from serious breaches in the social fabric which threaten grave harm to persons or property. We find the following factors to be useful in determining whether an activity violates the state's public policy in a nature serious enough to be considered "criminal": (1) the extent to which the activity directly threatens physical harm to persons or property or invades the rights of others; (2) the extent to which the law allows for exceptions and exemptions; (3) the blameworthiness of the actor; (4) the nature and severity of the potential penalties for a violation of the law.[6] This list is not meant to be exhaustive, and no single factor is dispositive.

## III

Applying the two-step approach to the driving regulations at hand, this court must first determine whether any of the regulations raise substantially different or heightened public policy concerns as compared to the policy underlying the general scheme of traffic and driving laws. The general public policy behind the state's traffic and driving laws is to protect the safety of persons and property on the roadways. This concern is mirrored by the policies behind the requirement of a valid license according to Minn.Stat. §§ 171.02, 171.27 (ensuring the competency of drivers); speed limits according to Minn.Stat. § 169.14 (safety of persons and property); and child restraint and seat belt use according to Minn.Stat. §§ 169.685,

---

4. *State v. Folstrom*, 331 N.W.2d 231 (1983), decided before *Cabazon*, held that Minn.Stat. § 624.714 (1982), prohibiting carrying a pistol without a permit, was a criminal law for purposes of Public Law 280. This determination was based on the fact that the law was located in the criminal code and contained a criminal penalty. However, in dicta, this court also found that the law would be criminal under the prohibitory/regulatory (*Cabazon* ) test. *Id.* at 233, fn. 1. Therefore, *Folstrom* remains good law.

5. *See* Bryan A. Garner, *A Dictionary of Modern Legal Usage* 712–13 (2d ed. 1995)(*Public policy* "refers rather vaguely to matters regarded by the legislature or by the courts as being of funda-

mental concern to the state and the whole of society.")

6. While the *Cabazon* Court stated that a criminal penalty does not convert a civil law into a criminal law, the nature of the penalty may be used to weigh the importance of the public policy underlying the statute. *See Welsh v. Wisconsin*, 466 U.S. 740, 754, 104 S.Ct. 2091, 2100, 80 L.Ed.2d 732 (1984)(relying on the fact that the state classified a first-time D.W.I. violation as a non-criminal, civil forfeiture offense, for which imprisonment was impossible to find that the state lacked a sufficient interest to support a warrantless home arrest).

subd. 5, 169.686 (ensuring safety of car occupants). Since none of these laws raises policy concerns which are substantially different or heightened from the general public policy behind the driving laws, they are properly analyzed as part of the broad conduct of driving.

In contrast, it is arguable that the policies underlying the laws requiring insurance and proof of insurance are different from the policy underlying the general activity of driving, in that they center upon economic reparation rather than safety. Minn.Stat. §§ 169.791, 169.797. However, we do not consider this difference to be substantial. Providing economic reparation for harm to persons and property is closely related to the general public policy of promoting the physical safety of drivers on the roadways. Similarly, while the law requiring current registration serves the policies of providing funds for the state and protecting property from theft, these policies are not so different from the policy underlying the generally permitted activity of driving as to require that these laws be analyzed separately. Minn.Stat. § 168.09.

Examples of traffic laws which might raise substantially different or heightened public policy concerns include Minn.Stat. § 169.121 (prohibiting drinking and driving) and Minn. Stat. § 169.13 (prohibiting both reckless and careless driving). The public policy underlying these laws is substantially heightened in comparison to the general scheme of driving laws, in that their violation creates a greater risk of direct injury to persons and property on the roadways. *See, e.g., State v. Teske,* 390 N.W.2d 388, 391 (Minn.App.1986)(standard for careless driving is "likely to endanger any property or person"); *State v. Horning,* 535 N.W.2d 296, 300 (Minn.1995) (Minn. Stat. § 169.121 intended to create as effective and encompassing a remedy as possible to eradicate drunk driving from our streets and highways).

Having determined that the broad conduct of driving is the proper focus of the *Cabazon* test, we apply the test to hold that driving is generally permitted, subject to regulation. Further, because driving clearly does not violate the public criminal policy of the state, there is no need to apply the shorthand public policy test. Therefore, each of the laws involved in this case is civil/regulatory and the state lacks jurisdiction under Public Law 280 to enforce them against members of the White Earth Band of Chippewa for conduct occurring within the boundaries of their reservation.[7]

## IV

Having disposed of the state's statutory claim, we now address the argument that the state may enforce the above traffic and driving-related laws in the absence of a federal grant of jurisdiction. The Supreme Court has not established a per se rule prohibiting the exercise of state jurisdiction over members of an Indian tribe in the absence of an express congressional grant of jurisdiction. *Cabazon,* 480 U.S. at 215, 107 S.Ct. at 1091. "Under certain circumstances a State may validly assert authority over the activities of nonmembers on a reservation, and * * * in exceptional circumstances a State may assert jurisdiction over the on-reservation activities of tribal members." *Id.* (citing *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 331–32, 103 S.Ct. 2378, 2384–85, 76 L.Ed.2d 611 (1983)). Cases presenting "exceptional circumstances," such that the Supreme Court has approved the exercise of state jurisdiction over the activities of member Indians on reservations without an express federal grant of authority, have primarily involved an indirect purpose to regulate non-Indians. *See Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (state could require "smoke shops" on reservation to collect state sales tax from non-Indian

7. In *Cabazon,* the Court noted that nothing in its decision suggested that cockfighting, tattoo parlors, nude dancing or prostitution would be permitted on Indian reservations. *Cabazon,* 480 U.S. at 211, fn. 10, 107 S.Ct. at 1089, fn. 10. In the same vein, we emphasize that nothing in this opinion would suggest that these activities are

civil/regulatory. We point out that Minnesota courts have not had a problem identifying clearly prohibitory laws. *See, e.g., State v. St. Clair,* 560 N.W.2d 732 (Minn.App.1997)(state had Public Law 280 jurisdiction to enforce fifth-degree marijuana charge against tribe member for offense occurring on reservation).

customers); *Moe v. Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976)(same). The only case in which the Supreme Court has permitted state regulation of Indians on a reservation without either a federal grant or a primary purpose of regulating non-members is *Puyallup Tribe v. Washington Game Dept.,* 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977). In *Puyallup,* the Supreme Court found that the State of Washington could regulate fishing by Indians on their reservation when the Treaty granting the Indians fishing rights required that the rights be exercised in common with the citizens of the state, the state's regulation was intended to preserve an important natural resource, and the land on which Indians fished, although within the reservation, no longer belonged to the tribe. *Id.* at 174–75, 97 S.Ct. at 2622–23.

In this case, the state of Minnesota seeks to apply its laws directly to members of the White Earth Band of Chippewa Indians for conduct occurring within the White Earth Reservation without any collateral purpose of controlling non-members. The appellant argues that an exceptional circumstance is presented by the lack of established law enforcement on the White Earth Reservation and the importance of the roadways to non-tribe members. We recognize Minnesota's interest in maintaining safe roads and highways. However, given the limited conditions under which the Supreme Court has allowed on-reservation jurisdiction over member Indians, we find that the appellant has not established extraordinary circumstances with which to overcome "the right of reservation Indians to make their own laws and be ruled by them." *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 142, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980) (citations omitted).

Additionally, we express our confidence that members of Indian tribes around the state will demand safe driving conditions on their reservations and that the tribes will respond to these demands with basic traffic and driving regulations and reasonable enforcement mechanisms. We anticipate that tribes without the resources to sustain their own enforcement systems will enter into co-operative agreements with state and local governments to obtain these services. In light of the White Earth Band of Chippewa Indians' recent adoption of a motor vehicle code and the existence of police and fire protection agreements between tribes and governmental units, such as the one between the City of Prior Lake and the Shakopee Community, we do not believe these expectations to be unfounded. Without exceptional circumstances, we do not reach the preemption analysis.

Affirmed.

TOMLJANOVICH, Justice (dissenting).

I respectfully dissent. Common sense dictates that the state may enforce its traffic and driving-related laws against members of the Indian tribe in this case where the reservation land in question is a highly traveled highway within the boundaries of the reservation.

I believe the state's interest in enforcing its traffic laws in this case rises to the level of an exceptional circumstance because of public safety. The term "on the reservation" calls to mind a pastoral scene isolated from the general commerce of the state where Native American persons can go about their daily lives free from interference by the state. This is not such an area; this is a highly traveled highway.

Public safety demands that all who travel public highways subject themselves to the laws of the State of Minnesota. Under the laws enunciated in this case, the state may not enforce laws prohibiting driving the wrong way on a one way roadway; passing on the right; those laws requiring us to yield to emergency vehicles; even those requiring us to stop and yield the right-of-way at a stop sign. Even basic equipment requirements, such as brakes and lights, may not be enforced by the state. I know that tribal members are not a lawless lot intent on violating basic safety rules. I also know, based on experience in the rest of the state, that there will be the occasional person who drives without lights or brakes and imperils the safety of all the other persons on the highway, so the power to enforce traffic laws is essential.

I do not believe any strong tribal interest would be served by the lack of enforcement of highway safety laws by the state. I would hold that the state may enforce its traffic and driving-related laws against members of the Indian tribe within the boundaries of the reservation.