**STATE of Minnesota, Appellant,**

v.

**Adria Anne JOHNSON, Respondent,**

**David Anthony Fineday, Respondent.**

Nos. C5–96–1854, C5–96–1858.

Supreme Court of Minnesota.

Aug. 12, 1999.

Jon P. Ectov, Assoc. Cass County Atty., Walker, Michael A. Hatch, Atty. Gen., St. Paul, for appellant.

Amber J. Ahola, Anishinabe Legal Services, Cass Lake, for respondents.

## OPINION

STRINGER, J.

The question before us is whether the State of Minnesota has subject-matter jurisdiction over the traffic offenses of failure to produce proof of insurance in violation of Minn.Stat. § 169.791 (1998), and driving after revocation in violation of Minn.Stat. § 171.24, subd. 2 (1998), when these offenses are committed by enrolled tribal members on the tribal reservation. We hold that under our ruling in *State v. Stone*, 572 N.W.2d 725 (Minn.1997), the state lacks jurisdiction because these offenses are not violations of criminal laws. We affirm the court of appeals.

Respondent Adria Anne Johnson is an enrolled member of the Minnesota Chippewa Tribe, Leech Lake Band. Her driver's license was revoked on October 11, 1994 for failure to provide proof of insurance in violation of Minn.Stat. § 169.791. In the early morning hours of January 13, 1996 while within the boundaries of the Leech Lake Reservation, she was stopped on Highway 60 in Cass County by a Cass County Deputy Sheriff and issued a citation for driving after revocation of her driver's license in violation of Minn.Stat. § 171.24, subd. 2, and for driving with an expired registration in violation of Minn. Stat. § 169.79. Approximately one hour later, the same officer stopped Johnson at a different location in Cass County but still within the boundaries of her tribal reservation, and again cited her for driving after revocation and for failing to provide proof of insurance in violation of Minn. Stat. § 169.791. Johnson moved to dismiss the charges for lack of subject-matter jurisdiction because she is an enrolled member of the Minnesota Chippewa Tribe,

Leech Lake Band, and the alleged offenses occurred within the boundaries of the Leech Lake Reservation. The district court denied Johnson's motion. Pursuant to a plea agreement, the state dismissed the expired registration charge and Johnson pleaded guilty to both driving after revocation charges and the charge of failure to provide proof of insurance. For each of the offenses, the court sentenced Johnson to a fine of $500 and 50 days in jail but stayed $150 of each fine and the jail term.

Respondent David Anthony Fineday was cited by a Cass Lake police officer for failing to provide proof of insurance in violation of Minn.Stat. § 169.791 following a minor traffic accident in the City of Cass Lake on the morning of July 20, 1996. At his arraignment Fineday moved to dismiss the charge because the court lacked subject matter jurisdiction.[1] He offered no evidence in support of this assertion, however. The court denied Fineday's motion to dismiss and he pled guilty to the violation of failure to provide proof of insurance. Fineday was sentenced to a $500 fine and 50 days in jail with the jail time stayed conditionally.

Johnson and Fineday each appealed to the court of appeals the district court's denial of their respective motions to dismiss and the two cases were consolidated for review. The court of appeals reversed concluding that the state does not have subject-matter jurisdiction to enforce either Minn.Stat. § 171.24, subd. 2 (driving after revocation) or Minn.Stat. § 169.791 (failure to provide proof of insurance) when violations are committed by enrolled tribal members on the tribal reservation. *State v. Johnson*, 1997 WL 104577 (Minn. App. March 11, 1997). We granted review of the consolidated appeals but stayed proceedings pending our decision in *State v. Stone*, 572 N.W.2d 725 (Minn.1997), and *State v. Jackson*, 570 N.W.2d 503 (Minn. 1997). The state now asks us to revisit

and reverse our decision in *Stone* and to hold that the state has subject-matter jurisdiction over violations of driving after revocation and failure to provide proof of insurance even though the violations are committed by enrolled tribal members on the tribal reservation. We decline to do so.

In our recent decision in *State v. Stone*, we thoroughly reviewed the history and precedents relating to the confluence of tribal sovereignty with the enforcement of state traffic laws against tribal members on tribal lands, looking particularly to *California v. Cabazon Band of Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), for guidance. *See Stone*, 572 N.W.2d at 728–31. Because under the authority of Public Law 280 and the Supreme Court's ruling in *Cabazon* only criminal laws can be enforced against tribal members on tribal land, we carefully articulated a test for determining whether a state law was civil/regulatory or criminal/prohibitory. *Id.* at 730. Based upon the Supreme Court's ruling in *Cabazon*, the test we articulated looks to the intent of the state law:

> [I]f the intent of a state law is generally to prohibit certain conduct, it falls within Pub.L.280's grant of criminal jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub.L. 280 does not authorize its enforcement on an Indian reservation. The shorthand test is whether the conduct at issue violates the State's public policy.

*Stone*, 572 N.W.2d at 729 (quoting *Cabazon*, 480 U.S. at 209, 107 S.Ct. 1083).

We acknowledged that the *Cabazon* test "admits of some ambiguity," and adopted a two-step approach for its application:

> The first step is to determine the focus of the *Cabazon* analysis. The broad

---

[1] The record does not reveal the basis for this assertion before the trial court. On appeal, Fineday argues that he is an enrolled member of the Minnesota Chippewa Tribe, Leech Lake Band, and that the alleged offense occurred within the boundaries of the Leech Lake Reservation.

conduct will be the focus of the test *unless* the narrow conduct presents substantially different or heightened public policy concerns. If this is the case, the narrow conduct must be analyzed apart from the broad conduct. After identifying the focus of the *Cabazon* test, the second step is to apply it. If the conduct is generally permitted, subject to exceptions, then the law controlling the conduct is civil/regulatory. If the conduct is generally prohibited, the law is criminal/prohibitory. In making this distinction in close cases, we are aided by *Cabazon's* "shorthand public policy test," which provides that conduct is criminal if it violates the state's public policy.

*Stone,* 572 N.W.2d at 730 (emphasis in original). We then interpreted "public policy" to mean public *criminal* policy – that is, policy that "seeks to protect society from serious breaches in the social fabric which threaten grave harm to persons or property." *Id.* Applying this test, we concluded that the state's driving regulations have as their general public policy protecting "the safety of persons and property on the roadways." *Id.* We cited a number of regulations related to requiring a valid license, obeying the speed limits, and mandating the use of personal restraint systems as examples of laws that do not raise concerns "substantially different or heightened from the general public policy behind the driving laws, [and] they are properly analyzed as part of the broad conduct of driving." *Id.* at 730-31. Laws requiring proof of insurance are more closely related to economic reparations than safety, but we saw no need to distinguish them from the general public policy relating to the safety of persons and property on the roadways, so these laws were also properly analyzed as part of the broad conduct of driving. *See id.* In contrast, we then cited traffic laws "which might raise substantially different or heightened public policy concerns" – laws prohibiting drinking and driving, and reckless or careless driving. *Id.*

We concluded in *Stone* that under the *Cabazon* test the broad conduct of driving is the proper focus and held that "driving is generally permitted, subject to regulation." *Id.* As a consequence, we held that each of the following regulations were civil/regulatory and the state therefore had no jurisdiction under Public Law 280 to enforce them against members of the White Earth Band of Chippewa for conduct occurring within the boundaries of their reservation:

1. Failure to provide motor vehicle insurance (Minn.Stat. § 169.797 (1996));

2. No proof of insurance (Minn.Stat. § 169.791 (1996));

3. Driving with an expired registration (Minn.Stat. § 168.09 (1996));

4. Driving without a license (Minn.Stat. § 171.02 (1996));

5. Driving with an expired driver's license (Minn.Stat. § 171.27 (1996));

6. Speeding (Minn.Stat. § 169.14 (1996));

7. Driving with no seat belt (Minn.Stat. § 169.686 (1996)); and

8. Failure to have child in a child restraint seat (Minn.Stat. § 19.685, subd. 5 (1996)).

*Stone,* 572 N.W.2d at 728, 732.

## I.

█ Our holding in *Stone* that failure to produce proof of insurance in violation of Minn.Stat. § 169.791 is civil/regulatory is conclusive as to the charge against Johnson for violating Minn.Stat. § 169.791 and the charge should have been dismissed. We so order. The charge against Fineday for violating the same law should also be dismissed upon proof that he is an enrolled member of the Minnesota Chippewa Tribe, Leech Lake Band, and that his alleged violation occurred within the boundaries of the Leech Lake Reservation. We therefore remand to the district court to make these factual determinations and to dispose of the matter in accordance with the findings and this court's ruling.

## II.

We next consider whether driving after revocation in violation of Minn.Stat. § 171.24, subd. 2, is criminal/prohibitory or civil/regulatory.

A fundamental difference between the offense of driving after revocation and other traffic offenses is that driving after revocation is a subsequent violation committed only after a driver's license has been revoked' because of a prior offense. *See* Minn.Stat. § 171.24, subd. 2. Obviously the prior offense carries its own sanction based upon the severity of the conduct. As each offense is triggered by different and unrelated conduct, the issue might then arise whether fairness should dictate that the nature of the subsequent offense, for purposes of the *Stone* analysis, not be measured by the nature of the prior offense, because if it were the offender could be subject to being sanctioned twice for the prior offense. Further, it is significant here that in *Stone* we held that driving without a valid license does not raise policy concerns substantially different from the general policy of public safety and therefore the violation is civil/regulatory. We would hardly be consistent to now conclude that even though a tribal member is not required to have a driver's license at all while driving on a tribal reservation, driving after revocation of a license should be an offense that rises to the level of a "heightened public policy" concern. *Stone,* 572 N.W.2d at 730.[2]

Appellants' concern that it will be difficult or impossible for law enforcement to determine at the scene of the traffic stop whether or not the state has jurisdiction over the alleged offense is misplaced. The simple answer is that a determination of jurisdiction need not be made at that time. The rule governing a challenge to jurisdiction of the court in misdemeanor cases states that "[a] motion to dismiss for want of personal jurisdiction shall not be made until *after* a complaint is filed * * *." Minn. R.Crim. P. 10.02 (emphasis added).

We reaffirm our holding in *Stone* that failure to produce proof of insurance in violation of Minn.Stat. § 169.791 is a civil/regulatory traffic violation over which the state had no jurisdiction when committed by tribal members on tribal land. We further hold that driving after revocation in violation of Minn.Stat. § 171.24, subd. 2, is also a civil/regulatory traffic violation as to which the court has no jurisdiction when committed by tribal members on tribal land.[3]

Affirmed.

PAUL H. ANDERSON, J. (concurring in part and dissenting in part).

I agree with the majority that *State v. Stone,* 572 N.W.2d 725 (Minn.1997), is dispositive of the issue of failure to produce proof of insurance. I also agree that David Anthony Fineday's case must be remanded to the district court for a determination of whether he is a member of the Minnesota Chippewa Tribe, Leech Lake Band, and whether his violation occurred within the boundaries of the Leech Lake

---

**2.** The dissent bases its disagreement with our opinion on a misperception of the offense of driving after revocation – that it evidences dangerous and noncompliant conduct, and "actively threatens physical harm to persons or property." Such a conclusion is no more warranted for driving after revocation than it would be for any of the eight offenses we held in *Stone* to be civil regulatory, and may in fact be less warranted than speeding, for example, where the conduct itself might have real and present implications of public endangerment.

**3.** The state asserts that even if Minnesota was not granted jurisdiction over the offenses charged under Public Law 280, the state may enforce its motor vehicle laws under *Cabazon's* preemption analysis because the state's interest exceeds that of the federal and tribal governments. *See Cabazon,* 480 U.S. at 215, 107 S.Ct. 1083 (commenting that under "exceptional circumstances" states may assert jurisdiction over the conduct of tribal members on tribal land) (quoting *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 331–32, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983)). We rejected this argument in *Stone* and need not repeat our analysis here. *Stone,* 572 N.W.2d at 731–32.

Reservation. I disagree, however, with the court's holding that the state lacks subject-matter jurisdiction to enforce Minn.Stat. § 171.24, subd. 2, driving after revocation, against Adria Anne Johnson because she is an enrolled tribal member who committed a violation of Minnesota law on the tribal reservation.

A. *Cabazon* Test

Indian tribes retain "attributes of sovereignty over both their members and their territor[ies]." *California v. Cabazon Band of Indians*, 480 U.S. 202, 207, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) (quoting *United States v. Mazurie*, 419 U.S. 544, 557, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975)). The tribes' sovereignty is "dependent on, and subordinate to, only the Federal Government, not the States." *Id.* at 207, 107 S.Ct. 1083 (quoting *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 154, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980)). However, when Congress expressly grants to a state the subject-matter jurisdiction to do so, a state may enforce state laws when those laws are violated by enrolled tribal members on the tribal reservation. *See id.* at 207, 107 S.Ct. 1083.

In Section 2(a) of Public Law 280, Congress expressly granted to Minnesota

> jurisdiction over offenses committed by or against Indians in the areas of Indian country * * * to the same extent that such State or Territory has jurisdiction over offenses committed elsewhere within the State or Territory, and the criminal laws of such State or Territory shall have the same force and effect within

such Indian country as they have elsewhere within the State or Territory.

Indians—Criminal Offenses and Civil Causes—State Jurisdiction, Pub.L. No. 83–280, 67 Stat. 588 (1953) (codified as amended at 18 U.S.C. § 1162(a) (1994)).[1] Congress granted this jurisdiction to Minnesota in an effort to combat "lawlessness on certain Indian reservations, and the absence of adequate tribal institutions for law enforcement." *Bryan v. Itasca County*, 426 U.S. 373, 379, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976). Specifically, this grant of jurisdiction was based on Congress' finding that, on many reservations, there was "a hiatus in law-enforcement authority that could best be remedied by conferring criminal jurisdiction on States * * *." H.R.Rep. No. 83–848, at 5–6 (1953).

In *Cabazon*, the United States Supreme Court defined the parameters of Public Law 280's jurisdictional grant, thereby clarifying which state laws Public Law 280 states have subject-matter jurisdiction to enforce when those laws are violated by enrolled tribal members on the tribal reservation.[2] The Court held in *Cabazon* that California, like other Public Law 280 states, was granted subject-matter jurisdiction to enforce its *criminal* laws when violations of those laws are "committed by or against Indians within [ ] Indian country." *Id.* at 207, 107 S.Ct. 1083. The Court then adopted the following test for determining whether a state law is criminal and thus enforceable against "Indians in Indian country":

> [I]f the intent of a state law is generally to prohibit certain conduct, it falls

1. The Red Lake Reservation was expressly excepted from state jurisdiction in Public Law 280. Minnesota retroceded jurisdiction of the Bois Forte (Nett Lake) Reservation. In Public Law 280, Congress also granted to five other states subject-matter jurisdiction over certain types of state laws when those laws are violated by enrolled tribal members on the tribal reservation. *See* Pub.L. No. 83–280, 67 Stat. at 588. Those states include: Alaska, California, Nebraska, Oregon, and Wisconsin. *See id.*

2. At issue in *Cabazon* was whether the state of California had subject-matter jurisdiction to enforce a state gambling law which limited the operation of bingo games to charitable and other specific organizations when that law was violated by the Cabazon Tribe of Indians on the tribal reservation. Violation of the gambling law in question constituted a misdemeanor.

within Pub.L. 280's grant of criminal jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub.L. 280 does not authorize its enforcement on an Indian reservation. The shorthand test is whether the conduct at issue violates the State's public policy.

*Id.* at 209, 107 S.Ct. 1083. In adopting this test, the Court noted that the test does not present a bright line rule and that strong arguments can often be made on both sides that a given law is either criminal/prohibitory or civil/regulatory. *See id.* at 210, 107 S.Ct. 1083. We acknowledged this point when we said in *Stone* that "the *Cabazon* test admits of some ambiguity." *Stone*, 572 N.W.2d at 729.

B. *Cabazon* Test as Applied in *State v. Stone*

In *State v. Stone*, we articulated what we believe to be the parameters of Public Law 280's grant of subject-matter jurisdiction as defined by the *Cabazon* test. *See* 572 N.W.2d at 730–31. In so doing, we set forth a two-step approach for determining when Minnesota has subject-matter jurisdiction to enforce its laws when violations of those laws are committed by enrolled tribal members on the tribal reservation. *See id.* Under the *Stone* approach, the first step is to determine the proper focus of the *Cabazon* test and the second step is to apply the *Cabazon* test to the conduct at issue. *See id.*

When using the *Stone* approach, courts first must determine the proper focus of the *Cabazon* test; that is, whether the *Cabazon* test should be applied to the broad conduct that encompasses the specific statutory provision being challenged, in this case driving and traffic laws as a whole, or to the narrow conduct described in the specific statutory provision itself, in this case driving after revocation. *See Stone*, 572 N.W.2d at 730. We stated that "[t]he broad conduct will be the focus of the test *unless* the narrow conduct presents substantially different or heightened public policy concerns." *Id.* If the narrow conduct does present substantially different or heightened public policy concerns, then courts must analyze the narrow conduct apart from the broad conduct. *See id.*

Once the proper focus of the *Cabazon* test is determined, courts must next apply the second step of the *Stone* approach by applying the *Cabazon* test to the conduct in question in order to determine whether the conduct at issue is civil/regulatory or criminal/prohibitory. *Stone*, 572 N.W.2d at 730. "If the conduct is generally permitted, subject to exceptions, then the [state] law controlling the conduct is civil/regulatory" and the state does not have subject-matter jurisdiction to enforce the provision when violations are committed by enrolled tribal members on the tribal reservation. *Id.* "If the conduct is generally prohibited, then the [state law controlling] the conduct is criminal/prohibitory" and the state does have subject-matter jurisdiction to enforce the provision. *Id.*

In close cases where it is difficult to determine whether the conduct at issue is generally permitted or generally prohibited, courts should apply the *Cabazon* "shorthand public policy test." *Cabazon*, 480 U.S. at 209, 107 S.Ct. 1083; *Stone*, 572 N.W.2d at 730. The *Cabazon* shorthand test provides that if the conduct at issue violates the state's public policy, then the state does have jurisdiction to enforce the state law controlling the conduct. Because the enforcement of virtually any law implicates some public policy, the public policy concerns that must be implicated when applying the *Cabazon* shorthand test are public *criminal* policy concerns, i.e., policy concerns that "seek to protect society from serious breaches in the social fabric which threaten grave harm to persons or property." *Stone*, 572 N.W.2d. at 730. In *Stone*, we identified four factors as useful when determining whether the conduct at issue violates the state's public criminal policy: "(1) the extent to which the [conduct] directly threatens physical harm to persons or property or invades the rights of others;

(2) the extent to which the law allows for exceptions and exemptions; (3) the blameworthiness of the actor; (4) the nature and severity of the potential penalties for a violation of the law." *Id.* In identifying these factors, we noted that no single factor is dispositive of the issue of whether conduct violates the state's public criminal policy and that the four factors listed are not the only factors courts may find useful in making that determination. *See id.*

It is in the context of this two-step *Stone* approach that we must analyze any violation of Minn.Stat. § 171.24, subd. 2, driving after revocation of driver's license, when that offense is committed by an enrolled tribal member on a tribal reservation.

C. Does Minnesota have subject-matter jurisdiction to enforce a violation of Minn.Stat. § 171.24, subd. 2 when the violation was committed by an enrolled tribal member on the tribal reservation?

Johnson was twice cited for violating Minn.Stat. § 171.24, subd. 2, driving after revocation of driver's license, the second citation being issued within one hour of the first. Minnesota Statutes § 171.24, subd. 2 provides that a person is guilty of a misdemeanor if:

(1) the person's driver's license or driving privilege has been revoked, (2) the person has been given notice of or reasonably should have known of the revocation; and (3) the person disobeys the order by operating in this state any motor vehicle, the operation of which requires a driver's license, while the person's license or privilege is revoked.

The state contends that it has subject-matter jurisdiction to enforce violations of Minn.Stat. § 171.24, subd. 2 when violations of this statute are committed by enrolled tribal members on the tribal reservation. Johnson contends that the state does not have such subject-matter jurisdiction.

1. Step one of the *Stone* approach

As previously noted, under the *Stone* approach, we first determine whether the *Cabazon* test should be applied to the broad conduct of driving or the narrow conduct of driving after revocation. In making this determination, we must decide whether the policies underlying Minn.Stat. § 171.24, subd. 2 present substantially different or heightened public policy concerns when compared with the public policy concerns underlying the state's traffic and driving laws as a whole. If we conclude the former, then the *Cabazon* test should be applied to the narrower conduct.

We said in *Stone* that the general public policy underlying the state's traffic and driving laws is to protect the safety of persons and property on the roadways. *See Stone,* 572 N.W.2d at 730. The public policy underlying the driving after revocation provision appears to be keeping off the state's roadways drivers who have demonstrated either their dangerousness or some other unwillingness to comply with the state's traffic laws, thus preventing drivers identified as dangerous and noncompliant from further endangering the safety of persons and property on the roadways. The majority states that because we held in *Stone* that driving without a valid license does not raise policy concerns substantially different from the general policy of public safety, we would "hardly be consistent" to conclude that driving after revocation of a license "rises to a level of 'heightened public policy' concerns." I disagree.

Keeping drivers specifically identified as dangerous or otherwise noncompliant with the state's traffic laws off the state's roadways raises substantially heightened public policy concerns when compared with the policy underlying the general scheme of the state's traffic and driving laws. Driving without a license, Minn.Stat. § 171.02 (1998), and driving with an expired license, Minn.Stat. § 171.27 (1998)—offenses held in *Stone* to be offenses over which the state lacked subject-matter jurisdiction—

do not implicate the heightened public policy concerns of driving after revocation. Unlike the two aforementioned offenses, a driver's license or driving privilege may be revoked only after affirmative steps to do so have been taken by appropriate government entities. Further, as previously noted, this action is only taken when a driver has demonstrated her dangerousness or some other unwillingness to comply with the state's traffic laws. *See* Minn.Stat. § 171.17, subd. 1 (1998) (listing certain offenses for which a person's license may be revoked). The ramifications on the motoring public and pedestrians of keeping drivers specifically identified as dangerous or otherwise noncompliant with state traffic laws off the state's highways are far greater and much more specific than the ramifications of someone driving without a license. Accordingly, I conclude that under step one of *Stone*, the policy underlying Minn.Stat. § 171.24, subd. 2 requires a focus on the narrow conduct of driving after revocation rather than the broad public policy underlying the state's traffic and driving laws as a whole.

### 2. Step two of the *Stone* approach

Having decided the proper focus of the *Cabazon* test, our next step is to apply the *Cabazon* test to the narrow conduct of driving after revocation in order to determine whether the conduct is civil/regulatory or criminal/prohibitory. If driving after revocation is generally permitted, subject to regulation, then the statute is civil/regulatory and the state does not have subject-matter jurisdiction under Public Law 280 to enforce Minn.Stat. § 171.24, subd. 2 when violations of that section are committed by enrolled tribal members on the tribal reservation. If driving after revocation is generally prohibited, then the statute is criminal/prohibitory and the state does have subject-matter jurisdiction under Public Law 280 to enforce Minn.Stat. § 171.24, subd. 2 when violations of that section are committed by enrolled tribal members on the tribal reservation. The plain language of Minn.Stat. § 171.24, subd. 2 categorically prohibits a person

whose driver's license has been revoked from "operating in this state any motor vehicle, the operation of which requires a driver's license, while the person's license or privilege is revoked." Minn.Stat. § 171.24, subd. 2(3). The statute itself does not allow for any exceptions to this prohibition. *See id.* Further, only in very few need-based circumstances may a person whose license has been revoked apply for and be granted a limited license to drive. *See* Minn.Stat. § 171.30 (1998). Therefore, I conclude that driving after revocation is generally prohibited and, thus, criminal/prohibitory. I also conclude that this determination does not present a close case and, thus, we need not apply the *Cabazon* shorthand test. Accordingly, I disagree with the majority and would hold that the state has subject-matter jurisdiction under Public Law 280 to enforce Minn.Stat. § 171.24, subd. 2 when violations of that section are committed by enrolled tribal members on the tribal reservation.

### 3. *Cabazon* shorthand test

Because I have concluded that determination of whether the narrow conduct of driving after revocation is generally prohibited or generally permitted but subject to regulation does not present a close case, there is no need to apply the *Cabazon* shorthand public policy test to Johnson's conduct. But even if I had concluded that this determination did present a close case, application of the *Cabazon* shorthand public policy test reveals that violations of Minn.Stat. § 171.24, subd. 2 contravene the state's public criminal policy and that, therefore, the state has subject-matter jurisdiction to enforce this section when violations are committed by enrolled tribal members on the tribal reservation.

In reaching my conclusion, I have applied the four factors we identified in *Stone* to the conduct of driving after revocation of driver's license. *See Stone*, 572 N.W.2d at 730. Under the first factor, in many instances, a person driving after rev-

ocation of her driver's license actively threatens physical harm to persons or property. Under the second factor, only limited exceptions are provided to the driving after revocation prohibition. Under the third factor, the person driving after revocation is completely blameworthy as she knows or should know of the revocation through the required notice provision of Minn.Stat. § 171.24. Under the fourth factor, a violation of Minn.Stat. § 171.24, subd. 2 carries a fine of at least $200 but not more than the maximum fine applicable to misdemeanors, currently $700, plus a misdemeanor jail sentence of up to 90 days. *See* Minn.Stat. §§ 609.03, 609.033 (1998). Repeat violations of some of the underlying offenses result in convictions for gross misdemeanors. Therefore, while not necessary under the facts of this case, application of the factors of the *Cabazon* shorthand test supports my conclusion that the state does have subject-matter jurisdiction under Public Law 280 to enforce Minn.Stat. § 171.24, subd. 2 when violations of that section are committed by enrolled tribal members on the tribal reservation.

D. *Stone* and Minn.Stat. § 169.14 (speeding)

One further point is worthy of comment. The majority states that in *Stone* we held that violations of Minnesota's speeding statute, Minn.Stat. § 169.14 (1998), are civil/regulatory and therefore the state has no jurisdiction to enforce violations of this statute against enrolled tribal members on the tribal reservation. While neither agreeing nor disagreeing with this statement, I submit that it is overly broad. The speeding offenses at issue in *Stone* were clearly civil/regulatory because they were petty misdemeanors. A different analysis may be applicable to misdemeanor speeding offenses and a different conclusion may result from this analysis. Therefore, *Stone* did not completely resolve this issue; rather its resolution awaits a later day.

GILBERT, J. (concurring in part, dissenting in part).

I join in the concurrence/dissent of Justice Paul H. Anderson.