*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0199**

State of Minnesota,
Respondent,

vs.

Tressa Lee Bissonette,
Appellant.

**Filed October 11, 2016
Affirmed
Larkin, Judge**

Cass County District Court
File No. 11-CR-14-1686

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Christopher J. Strandlie, Cass County Attorney, Jeanine R. Brand, Assistant County Attorney, Walker, Minnesota (for respondent)

Frank Bibeau, Bibeau Law Office, Deer River, Minnesota (for appellant)

Considered and decided by Connolly, Presiding Judge; Larkin, Judge; and Bratvold, Judge.

**UNPUBLISHED OPINION**

**LARKIN**, Judge

On appeal from her conviction of gross-misdemeanor child neglect, appellant argues that the district court erred by denying her motion to dismiss for lack of jurisdiction. Because Public Law 280 expressly grants the State of Minnesota jurisdiction over the offense, we affirm.

## FACTS

Respondent State of Minnesota charged appellant Tressa Lee Bissonette with one count of gross-misdemeanor neglect of a child under Minn. Stat. § 609.378, subd. 1(a)(1) (2014). According to the complaint, on August 21, 2014 at approximately 10:21 p.m., a law-enforcement officer found a four- to five-year-old child riding a bicycle unsupervised on County Road 75, outside of a bar in Cass County.[1] The complaint alleged that the child's mother, Bissonette, was passed out in the family's home a quarter mile away. An officer "had to yell at [Bissonette] to wake her up," observed that she had slurred speech and poor balance, and smelled an odor of alcohol on her breath. Bissonette admitted that she had been drinking all day at a wedding and s        aid that she did not know how long she had been passed out.

Bissonette moved to dismiss the child-neglect charge, arguing that the state lacked jurisdiction over the offense because the child-neglect-and-endangerment statute "is a civil/regulatory law" and therefore does not fall under the express federal grant of criminal

---

[1] The parties do not dispute that the conduct at issue occurred on the Leech Lake Reservation.

jurisdiction to Minnesota over enrolled tribal members on reservations under Public Law 280. The district court denied Bissonette's motion. Bissonette stipulated to the prosecution's case under Minn. R. Crim. P. 26.01, subd. 4, and the district court found her guilty of neglect of a child. Bissonette appeals.

## DECISION

## I.

"Whether the state has jurisdiction to enforce its laws with respect to an Indian charged with an offense committed on [her] reservation is an issue that [appellate courts] review de novo without considering the decisions of the lower courts." *State v. Busse*, 644 N.W.2d 79, 82 (Minn. 2002).

We begin our de novo review with the state's argument that the factual record does not support Bissonette's jurisdictional challenge. The state asserts that Bissonette did not present evidence establishing that she "is an Indian" or "works in the Leech Lake Reservation" and argues that "[b]ecause there is no record of [Bissonette] being Native American, an enrolled member of any tribe, or that Leech Lake is within federal jurisdiction, nearly all of [Bissonette's] arguments facially fail."

Because the state did not attack the factual basis for Bissonette's jurisdictional challenge in district court, the district court did not consider or determine whether the factual record supported the challenge. An appellate court generally will not decide issues that were not raised and determined in the district court. *Roby v. State*, 547 N.W.2d 354, 357 (Minn. 1996). However, an appellate court has discretion to consider issues for the first time on appeal "when the interests of justice require their consideration and addressing

3

them would not work an unfair surprise on a party." *State v. Sorenson*, 441 N.W.2d 455, 457 (Minn. 1989).

Here, the state opposed Bissonette's jurisdictional challenge on the merits in district court, seemingly accepting the factual basis for the challenge. Bissonette cannot supplement the factual record on appeal. *See State v. Colvin*, 645 N.W.2d 449, 453 (Minn. 2002) ("Appellate courts have no . . . business finding facts . . . ."). Under the circumstances, allowing the state to attack the factual basis for Bissonette's jurisdictional challenge for the first time on appeal would work an unfair surprise on Bissonette. And because we ultimately conclude that Bissonette's jurisdictional challenge fails on the merits, we focus our review on the substantive merits of the challenge.

**II.**

"State law does not generally apply to tribal Indians on their reservations absent express consent from Congress." *Busse*, 644 N.W.2d at 82. In Public Law 280, Congress expressly granted Minnesota "jurisdiction over offenses committed by or against Indians" on reservations within Minnesota as well as limited jurisdiction "over civil causes of action between Indians or to which Indians are parties" that arise on reservations within Minnesota. 18 U.S.C. § 1162(a) (2012) (providing that Minnesota "shall have jurisdiction over offenses committed by or against Indians" in "[a]ll Indian country within the State, except the Red Lake Reservation"); 28 U.S.C. § 1360(a) (2012) (providing Minnesota with limited jurisdiction "over civil causes of action between Indians or to which Indians are parties" which arise in "Indian Country within the State, except the Red Lake

4

Reservation"); *see State v. Jones*, 729 N.W.2d 1, 4 (Minn. 2007) ("Minnesota has broad criminal and limited civil jurisdiction over all 'Indian country' within the state, except for the Red Lake Reservation and the Bois Forte Reservation at Nett Lake.").

To ascertain whether a statute is within Public Law 280's express grant of jurisdiction, courts must determine whether the statute is "criminal/prohibitory" or "civil/regulatory." *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 209-10, 107 S. Ct. 1083, 1088-89 (1987) (quotation marks omitted); *see also State v. Stone*, 572 N.W.2d 725, 729 (Minn. 1997) (applying the *Cabazon* test).

> [I]f the intent of a state law is generally to prohibit certain conduct, it falls within Pub. L. 280's grant of criminal jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub. L. 280 does not authorize its enforcement on an Indian reservation.

*Cabazon*, 480 U.S. at 209, 107 S. Ct. at 1088.

The Minnesota Supreme Court has adopted a two-step approach to the *Cabazon* prohibitory/regulatory test. *Stone*, 572 N.W.2d at 730; *see State v. Losh*, 755 N.W.2d 736, 744 (Minn. 2008) (applying *Stone* two-step approach to the *Cabazon* test). First, Minnesota courts determine whether the *Cabazon* analysis should focus on the broad or narrow conduct affected by the statute. *Stone*, 572 N.W.2d at 729-30. For example, the broad conduct affected by a statute prohibiting underage alcohol consumption is alcohol consumption, and the narrow conduct is the consumption of alcohol by persons under the drinking age. *State v. Robinson*, 572 N.W.2d 720, 723 (Minn. 1997). "The broad conduct will be the focus of the test *unless* the narrow conduct presents substantially different or

5

heightened public-policy concerns. If this is the case, the narrow conduct must be analyzed apart from the broad conduct." *Stone*, 572 N.W.2d at 730.

After identifying the proper focus, Minnesota courts apply the *Cabazon* test to determine whether the conduct at issue is generally permitted subject to exceptions or generally prohibited. *Id.* In close cases, Minnesota courts consider whether the conduct at issue violates the state's public criminal policy seriously enough to be considered "criminal." *Id.* In doing so, courts consider four factors, but no single factor is dispositive. *See id.* (describing factors).

Bissonette argues that the *Stone* test is "too unreliable and subjective to be useful" and generally criticizes Minnesota caselaw regarding the State of Minnesota's jurisdiction over offenses arising in Indian country within the state. However, "[t]his court is bound by decision[s] of the Minnesota Supreme Court." *Citizens for a Balanced City v. Plymouth Congregational Church*, 672 N.W.2d 13, 20 (Minn. App. 2003). We therefore follow Minnesota precedent when analyzing Bissonette's jurisdictional challenge.

Bissonette was convicted of child neglect under Minn. Stat. § 609.378, subd. 1(a)(1). The statute provides that:

> A parent, legal guardian, or caretaker who willfully deprives a child of necessary food, clothing, shelter, health care, or supervision appropriate to the child's age, when the parent, guardian, or caretaker is reasonably able to make the necessary provisions and the deprivation harms or is likely to substantially harm the child's physical, mental, or emotional health is guilty of neglect of a child and may be sentenced to imprisonment for not more than one year or to payment of a fine of not more than $3,000, or both.

Minn. Stat. § 609.378, subd. 1(a)(1).

6

Bissonette contends that because the child-neglect statute concerns "subjective degrees of negligence with regard to watching a child, which are domestic, internal relations for any and all tribal members on the reservation," it is not a criminal/prohibitory statute. Bissonette argues that "Public Law 280 did not provide for this kind of jurisdiction, which is why the Indian Child Welfare Act was adopted." Bissonette further argues that the statute is "civil/regulatory in nature . . . because of the *religious civil rights exception*" within the statute.

We begin by identifying the broad and narrow conduct affected by the statute. Arguably, the broad conduct affected by the statute could be either all child neglect or parenting in general. The narrow conduct is limited to child neglect that "harms or is likely to substantially harm [a] child's physical, mental, or emotional health." *Id.* The statute prohibits conduct that is more likely than not to substantially harm children, who are especially vulnerable; it does not prohibit conduct that merely deviates from a reasonable standard of care. *See State v. Tice*, 686 N.W.2d 351, 355 (Minn. App. 2004) (noting that the child-neglect statute only criminalizes "conduct that is *more* than ordinary civil negligence"), *review denied* (Minn. Nov. 16, 2004). Because the child-neglect statute regulates conduct that harms or is likely to substantially harm children, it presents heightened public-policy concerns.

Whether we identify the broad conduct as all child neglect or parenting in general, the more specific conduct prohibited by the statute presents heightened public-policy concerns and justifies focusing on that narrow conduct when applying the *Cabazon* test. *See Stone*, 572 N.W.2d at 730 (stating that the narrow conduct affected by a statute will be

7

analyzed apart from the broad conduct when the narrow conduct presents heightened public-policy concerns).

We next consider whether child neglect, as described in the child-neglect statute, is generally permitted subject to exceptions or is generally prohibited. *See id.* ("After identifying the focus of the *Cabazon* test, the second step is to apply it."). We are guided by the public criminal-policy factors set forth in *Stone*, which are the: (1) extent to which the activity directly threatens physical harm to persons or property or invades the rights of others; (2) extent to which the law allows for exceptions and exemptions; (3) blameworthiness of the actor; and (4) type and severity of the potential penalties for a violation of the law. *Id.*

The existence of an exception in the child-neglect statute for good-faith use of spiritual means or prayer for treatment favors classifying the statute as civil/regulatory. *See* Minn. Stat. § 609.378, subd. 1(a)(1) ("If a parent, guardian, or caretaker responsible for the child's care in good faith selects and depends upon spiritual means or prayer for treatment or care of disease or remedial care of the child, this treatment or care is 'health care,' for purposes of this clause.").

However, the three other public criminal-policy factors favor classifying the statute as criminal/prohibitory. The child-neglect statute applies to conduct that "harms or is likely to substantially harm [a] child's physical . . . health." *Id.* The statute therefore regulates activity that directly threatens physical harm to persons, and the harm factor favors classifying the child-neglect statute as criminal/prohibitory. Moreover, we have no difficulty concluding that a person with caretaking responsibilities for a child who

"willfully deprives" that child of "necessary food, clothing, shelter, health care, or supervision appropriate to the child's age" is blameworthy. *Id.* Lastly, a person who is guilty of child neglect that does not cause actual substantial harm, as is the case here, "may be sentenced to imprisonment for not more than one year or to payment of a fine of not more than $3,000, or both." *Id.* "If the deprivation results in substantial harm to the child's physical, mental, or emotional health, the person may be sentenced to imprisonment for not more than five years or to payment of a fine of not more than $10,000, or both." *Id.*

The existence of a criminal penalty alone does not dictate that the child-neglect statute is criminal/prohibitory. *See Jones*, 729 N.W.2d at 9 ("The existence of a criminal penalty alone does not dictate that a law is criminal/prohibitory . . . ."); *see also Cabazon*, 480 U.S. at 211, 107 S. Ct. at 1089 ("But that an otherwise regulatory law is enforceable by criminal as well as civil means does not necessarily convert it into a criminal law within the meaning of Pub. L. 280."). However, the fact that the legislature established gross-misdemeanor and felony penalties for violations of the child-neglect statute supports the conclusion that the statute is criminal/prohibitory. *See Robinson*, 572 N.W.2d at 724 (concluding that the four-factor public criminal-policy analysis supported a determination that the underage-alcohol-consumption statute is criminal partly because the statute provides for a "criminal misdemeanor penalty").

In sum, because three of the four public criminal-policy factors support a conclusion that the child-neglect statute applies to conduct that is generally prohibited, we conclude that the statute is criminal/prohibitory. Because the child-neglect statute is criminal/prohibitory, the state has express jurisdiction under Public Law 280 to enforce the

9

statute within the boundaries of the Leech Lake Reservation. We therefore affirm without addressing Bissonette's arguments that presume the absence of an express grant of jurisdiction. *See, e.g.*, *State v. R.M.H.*, 617 N.W.2d 55, 60-65 (Minn. 2000) (discussing the extent to which the state can exercise jurisdiction on a tribal reservation absent express federal consent); *Stone*, 572 N.W.2d at 731-32 (describing "exceptional circumstances" in which a state may assert jurisdiction over the on-reservation activities of tribal members without an express federal grant of authority (quotation marks omitted)).

**Affirmed.**