**STATE of Minnesota, Respondent,**

v.

**William LOSH, Appellant.**

No. A06–1910.

Court of Appeals of Minnesota.

Oct. 9, 2007.

John M. Stuart, State Public Defender, Theodora K. Gaïtas, Assistant State Public Defender, Minneapolis, MN; and John J. Brogan, Special Assistant State Public Defender, Dorsey & Whitney, Minneapolis, MN, for appellant.

Lori Swanson, Attorney General, St. Paul, MN; and John J. Muhar, Itasca County Attorney, Heidi M. Chandler, Assistant County Attorney, Grand Rapids, MN, for respondent.

Considered and decided by SHUMAKER, Presiding Judge; STONEBURNER, Judge; and WRIGHT, Judge.

## OPINION

WRIGHT, Judge.

In this appeal from a conviction of driving after revocation, appellant, a member of a band of the Minnesota Chippewa Tribe, argues that the district court did not have subject-matter jurisdiction over the offense, which occurred on the reservation of a different band of the Minnesota Chippewa Tribe. We affirm.

## FACTS

Appellant William Losh is enrolled in the Mille Lacs Band of Ojibwe, a band of the Minnesota Chippewa Tribe. On December 14, 2005, while driving on the reservation of the Leech Lake Band of Ojibwe, another band of the Minnesota Chippewa Tribe, Losh was cited for driving after revocation, a violation of Minn. Stat. § 171.24, subd. 2 (2004). The parties stipulated that Losh's driver's license was revoked on or about October 14, 2000, based on the alcohol-related driving offense of driving while impaired.

Losh moved to remove this matter to tribal court, arguing that the district court lacks subject-matter jurisdiction over offenses committed by Indians in Indian country. In an order filed June 15, 2006, the district court denied this motion. Quoting *State v. R.M.H.*, 617 N.W.2d 55, 63 (Minn.2000), the district court held that Losh, a nonmember of the Leech Lake Band of Ojibwe, "is not entitled to the same 'insulation from state government authority' on the Leech Lake Reservation because the Leech Lake Band's sovereign interest is not as strongly implicated as it would be with an enrolled member."

■ Losh submitted the case to the district court for a trial on stipulated facts, which preserved this jurisdictional issue for appeal.[1] The district court found Losh guilty of the charged offense, and this appeal followed.

## ISSUE

If the predicate driver's-license revocation is based on an alcohol-related driving offense, does the district court have subject-matter jurisdiction over a charge of driving after revocation, a violation of Minn.Stat. § 171.24, subd. 5 (2004), against an enrolled member of a band of the Minnesota Chippewa Tribe when the charged offense occurred on the reservation of another band of the tribe?

## ANALYSIS

■ Subject-matter jurisdiction presents a question of law, which we review de novo. *State v. R.M.H.*, 617 N.W.2d 55, 58 (Minn.2000). Whether and under what circumstances Minnesota has jurisdiction over Indians in Indian country is governed by federal law. *See* Act of Aug. 15, 1953, Pub.L. No. 280, 67 Stat. 588 (partially codified at 18 U.S.C. § 1162 (2000)); *see also R.M.H.*, 617 N.W.2d at 58 ("State jurisdiction over Indians is governed by federal statutes or case law."). Generally, state law may not be applied to Indians in Indian country unless federal law expressly so provides. *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 214, 107 S.Ct. 1083, 1091, 94 L.Ed.2d 244 (1987); *R.M.H.*, 617 N.W.2d at 58; *see*

*also State v. Stone*, 572 N.W.2d 725, 728 (Minn.1997) ("[I]t is established that state laws may be applied to tribal Indians on their reservations if Congress has expressly so provided."). Absent an express provision, state law may be applied to Indians in Indian country only if "exceptional circumstances" warranting such an application exist. *Stone*, 572 N.W.2d at 731 (citing *Cabazon*, 480 U.S. at 215, 107 S.Ct. at 1091).

Public Law 280 expressly grants Minnesota "broad criminal and limited civil jurisdiction over all Indian country within the state, except for the Red Lake Reservation." *State v. Jones*, 729 N.W.2d 1, 4 (Minn.2007) (quotation omitted); 18 U.S.C. § 1162(a); *see also* Act of May 23, 1973, ch. 625, 1973 Minn. Laws 1500 (retroceding criminal jurisdiction for Bois Forte Indian Reservation at Nett Lake back to federal government under authority of 25 U.S.C. § 1323 (2000)). In *California v. Cabazon Band of Mission Indians*, the United States Supreme Court held that the enforcement of criminal statutes, which are those statutes that are generally intended to prohibit certain conduct, falls within this express grant of jurisdiction. 480 U.S. at 209–10, 107 S.Ct. at 1088. Conversely, the enforcement of civil/regulatory statutes, which are those statutes that generally permit the conduct at issue subject to certain exceptions and regulations, falls outside of Public Law 280's express grant of jurisdiction. *Id.; Stone*, 572 N.W.2d at 730.

---

**1.** It is unclear from the record whether the parties submitted the case on stipulated facts under Minn. R.Crim. P. 26.01, subd. 3, which permits an appellant to "raise issues on appeal the same as from any trial," including pretrial issues, or under the procedure set forth in *State v. Lothenbach*, 296 N.W.2d 854 (Minn.1980), which preserves only pretrial issues for appeal. *See State v. Mahr*, 701 N.W.2d 286, 291 (Minn.App.2005) (discussing

distinction between rule 26.01 and *Lothenbach*), *review denied* (Minn. Oct. 26, 2005). Because the issue of subject-matter jurisdiction can be raised at any time in a proceeding, *Cochrane v. Tudor Oaks Condo. Project*, 529 N.W.2d 429, 432 (Minn.App.1995), the issue is properly before us regardless of whether the case was submitted under rule 26.01 or the procedure set forth in *Lothenbach*.

In *Stone*, the Minnesota Supreme Court adopted a two-step approach for determining whether a statute is criminal or civil/regulatory. 572 N.W.2d at 730. The first step requires courts to determine "the focus of the *Cabazon* analysis." *Id.* The *Stone* court held that the broad conduct that is the subject of the statute is the "focus," unless the narrow conduct regulated by the statute presents "substantially different or heightened public policy concerns." *Id.*[2] To assist courts in determining whether substantially different or heightened public-policy concerns are presented, the *Stone* court identified the following factors for consideration:

(1) the extent to which the [conduct] directly threatens physical harm to persons or property or invades the rights of others; (2) the extent to which the law allows for exceptions and exemptions; (3) the blameworthiness of the actor; [and] (4) the nature and severity of the potential penalties for a violation of the law.

*Id.*

After determining whether the focus of the *Cabazon* analysis is the broad or narrow conduct regulated, the second step requires courts to determine whether that focused-on conduct is generally prohibited or generally permitted, subject to exceptions. *Id.* If the conduct is generally prohibited, then the statute that regulates that conduct is criminal. *Id.* If it is generally permitted, subject to exceptions, then the statute is civil/regulatory. *Id.*

The *Stone* court considered whether several statutes were criminal or civil/regulatory, including Minn.Stat. § 171.02 (1996) (prohibiting driving without driver's license) and Minn.Stat. § 171.27 (1996) (prohibiting driving with expired driver's license). *Id.* at 728. In applying the first step, the *Stone* court observed that the policy underlying the general scheme of traffic and driving laws—protect[ing] the safety of persons and property on the roadways—is "mirrored by the policies behind the [statutory] requirement of a valid [driver's] license," namely, ensuring the competency of drivers. Id. at 730. Therefore, it concluded that, because the statutes that prohibit driving without a valid driver's license or driving with an expired driver's license do not raise public policy concerns that are "substantially different or heightened from the general public policy behind the driving laws," those statutes "are properly analyzed as part of the broad conduct of driving." *Id.* at 731.

Having determined that the broad conduct of driving is the focus of the *Cabazon* analysis, the *Stone* court applied the second step and concluded that the focused-on conduct of driving is generally permitted, subject to regulation. *Id.* Therefore, it held that the statutes that make it unlawful to drive without a driver's license or with an expired driver's license are civil/regulatory and, consequently, are outside the express grant of jurisdiction of Public Law 280. *Id.*

The statute at issue in this case, Minn. Stat. § 171.24, subd. 2 (2004), prohibits a person from driving after his or her driver's license was revoked. In *State v. Johnson*, the supreme court applied *Stone's* two-step approach to determine whether that statutory provision is criminal or civil/regulatory. 598 N.W.2d 680, 684 (Minn.1999). There, the defendant, an enrolled member of the Leech Lake Band of Ojibwe, was driving on the Leech Lake

---

2. The *Stone* court interpreted the "public policy" referred to in the *Cabazon* test "to mean public *criminal* policy," which is public policy that "seeks to protect society from serious breaches in the social fabric which threaten grave harm to persons or property." 572 N.W.2d at 730.

Band of Ojibwe's reservation when she was issued a citation for driving after her driver's license was revoked for failure to provide proof of insurance. *Id.* at 681. The *Johnson* court observed that there is "[a] fundamental difference between the offense of driving after revocation and other traffic offenses," namely, that "driving after revocation is a subsequent violation committed only after a driver's license has been revoked because of a prior offense." *Id.* at 684. Nevertheless, it concluded that it would be inconsistent with *Stone's* holding that driving without a valid driver's license does not raise public policy concerns that are substantially different or heightened from the general policy of public safety to now conclude that driving after revocation is an offense that "rises to the level of a 'heightened public policy' concern." *Id.* (quoting *Stone,* 572 N.W.2d at 730). Thus, the *Johnson* court held that "driving after revocation in violation of Minn.Stat. § 171.24, subd. 2, is ... a civil/regulatory traffic violation as to which the [state] court[s] ha[ve] no jurisdiction when committed by tribal members on tribal land." *Id.*

Less than three years later, the supreme court clarified its holding in *Johnson.* In *State v. Busse,* a member of the White Earth Band of Ojibwe was driving on the White Earth Band of Ojibwe's reservation when he was cited for driving after cancellation as inimical to public safety in violation of Minn.Stat. § 171.24, subd. 5 (1998). 644 N.W.2d 79, 80–81 (Minn. 2002). His driver's license was cancelled as inimical to public safety based on his four prior driving-under-the-influence convictions. *Id.* at 80. On appeal, the state argued that the offense of driving after cancellation as inimical to public safety is distinguishable from the driving-after-revocation offense at issue in *Johnson* because "driving after cancellation as inimical to public safety is one of the state's

mechanisms to enforce driving under the influence violations and therefore raises heightened public policy concerns." *Id.* at 82. The *Busse* court agreed. *Id.* at 87–88. It held that "it is not only the fact of revocation, suspension, cancellation, or other administrative action with respect to a [driver's] license that is significant for purposes of determining heightened public policy." *Id.* at 87. Rather, courts must consider whether the revocation, suspension, cancellation, or other administrative action reflects the existence of a particularly severe threat to safety. *Id.* The *Busse* court held that the offense of driving after cancellation as inimical to public safety reflects such a threat, and, consequently, is distinguishable from *Johnson's* offense of driving after a revocation based on a failure to provide proof of insurance. *Id.* at 87–88. In reaching this holding, however, the *Busse* court observed that *Johnson* does not preclude a determination that section 171.24, subdivision 2, is a criminal statute when the circumstances surrounding the defendant's revocation reflect heightened public policy concerns, such as "a revocation ... based on prior alcohol-related offenses." *Id.* at 87.

Here, the stipulated facts and evidence in the record establish that Losh's driver's license revocation was the result of his prior alcohol-related driving offense of driving under the influence. Therefore, as in *Busse,* Losh's offense of driving after revocation is "inextricably linked to [his] driving under the influence conviction[ ] and the state's efforts to halt further driving by those who disregard the state's driving under the influence laws." *Id.* As the *Busse* court has held, the public policy underlying laws that are intended to halt further driving by those who disregard the laws that prohibit persons from driving under the influence "'is substantially heightened in comparison to the general

scheme of driving laws.'" *Id.* at 85 (quoting *Stone,* 572 N.W.2d at 731).

A consideration of the factors the *Busse* court identified as useful for determining whether the narrow conduct regulated by a statute presents heightened public policy concerns also establishes that the narrow conduct of driving after a revocation based on an alcohol-related driving offense implicates heightened public policy concerns. *See Stone,* 572 N.W.2d at 730((1) extent to which conduct directly threatens physical harm or invades others' rights; (2) extent to which law allows for exceptions and exemptions; (3) actor's blameworthiness; (4) nature and severity of potential penalties for violation of law). First, the *Stone* court has held that violations of laws that are intended to combat driving under the influence "create[ ] a greater risk of direct injury to persons and property on the roadways." *Id.* at 731. Second, Minnesota law does not provide for exceptions to or exemptions from the prohibition against driving after revocation. *See* Minn.Stat. § 169A.55, subd. 2 (2006) ("[I]f driving is resumed without reinstatement of driving privileges, ... the person will be subject to criminal penalties."). Third, a person who continues to drive after being revoked is blameworthy because that person is engaging in this conduct despite receiving written notice that it is illegal. *See id.* (requiring commissioner to send written notice that driving before reinstatement carries criminal penalties); *see also* Minn. Stat. § 171.17, subd. 3 (2006) (requiring driver to be provided with written notice immediately upon revocation). And here, Losh admitted during trial that he knew or should have known that his driving privileges were revoked. Finally, the legislature has determined that continuing to drive after revocation warrants a criminal sanction. *See* Minn.Stat. § 169A.55, subd. 2.

Because Losh's offense of driving after revocation based on a prior alcohol-related driving offense implicates heightened public policy concerns, the first step in *Stone's* two-step approach establishes that the focus of the *Cabazon* analysis is Losh's narrow conduct of driving after revocation. The second step requires us to determine whether that focused-on conduct is generally prohibited or generally permitted, subject to exceptions. *Busse,* 644 N.W.2d at 88; *Stone,* 572 N.W.2d at 730. In Minnesota, the conduct of driving after revocation is strictly prohibited. Minn. Stat. § 171.24, subd. 2 (making it unlawful for person who knows or has reason to know that his or her driver's license was revoked to drive). Thus, under these circumstances, the statute that regulates this conduct, Minn.Stat. § 171.24, subd. 2, is a criminal statute. And because it is a criminal statute, it is within Public Law 280's express grant of subject-matter jurisdiction to Minnesota's state courts. 18 U.S.C. § 1162(a); *see Cabazon,* 480 U.S. at 209, 107 S.Ct. at 1088; *R.M.H.,* 617 N.W.2d at 59. Accordingly, the district court correctly concluded that it had subject-matter jurisdiction over Losh's driving-after-revocation offense.

Because we conclude that Losh's offense falls within Public Law 280's express grant of subject-matter jurisdiction to the district court, we need not reach the state's argument that, in the absence of an express grant, exceptional circumstances warrant the district court's exercise of subject-matter jurisdiction over this offense. *See Stone,* 572 N.W.2d at 731 (holding that absent express grant of jurisdiction, state law may be applied to Indians in Indian country if "exceptional circumstances" exist).

## DECISION

Federal law expressly grants the district court subject-matter jurisdiction over ap-

pellant's offense of driving after revocation based on a prior alcohol-related offense because, under these circumstances, the statute that regulates that offense is a criminal statute. Therefore, the district court correctly concluded that it had subject-matter jurisdiction. Because subject-matter jurisdiction is the sole issue in this appeal from Losh's conviction, we affirm.

**Affirmed.**