STATE of Minnesota, Respondent,

v.

**William LOSH, Appellant.**

**No. A06–1910.**

Supreme Court of Minnesota.

Sept. 18, 2008.

Lawrence Hammerling, Chief Appellate Public Defender, Theodora K. Gaitas, Asst. State Public Defender, St. Paul, MN; and John J. Brogan, Jonathan Bakewicz, Stephanie Friedland, Special Asst. State Public Defenders, Minneapolis, MN, for appellant.

Lori Swanson, State Attorney General, St. Paul, MN; and John J. Muhar, Itasca County Attorney, Heidi M. Chandler, Asst. Itasca County Attorney, Grand Rapids, MN, for respondent.

Frank Warren Bibeau, Cass Lake, MN, for amicus curiae Anishinabe Legal Services.

## OPINION

DIETZEN, Justice.

Appellant William Losh, who is a member of the Mille Lacs Band of the Minnesota Chippewa Tribe, challenges his conviction of driving a motor vehicle after revocation, in violation of Minn.Stat. § 171.24, subd. 2 (2006), arguing that the court lacks subject-matter jurisdiction. The district court found jurisdiction on the ground that the offense occurred within the boundaries of the Leech Lake Reservation and that Losh is not a member of the Leech Lake Band. The court of appeals affirmed, but on different grounds. *State v. Losh*, 739 N.W.2d 730, 736 (Minn. App.2007). Specifically, it concluded that the charged offense was criminal/prohibitory and, therefore, the court had subject-matter jurisdiction under Public Law 280. *Id.* at 735–36. At issue is whether driving after revocation, in violation of Minn.Stat. § 171.24, subd. 2, is criminal/prohibitory under Public Law 280 when the defen-

dant's license was revoked for driving while impaired. We affirm.

Losh was stopped on December 14, 2005, for speeding on a state highway on the Leech Lake Reservation. Losh is not a member of the Leech Lake Band. He is a member of the Minnesota Chippewa Tribe (MCT), which is a federally recognized tribe created in 1934 that consists of six bands of Chippewa Indians, including the Mille Lacs Band and the Leech Lake Band. When the officer making the stop discovered that Losh's driving privileges had been revoked, he was charged with driving a motor vehicle after revocation, in violation of Minn.Stat. § 171.24, subd. 2.

Losh's driving privileges were revoked in October 2000 by the State under the implied-consent laws for operating a motor vehicle with a blood-alcohol concentration of 0.15. Minn.Stat. § 169A.52, subd. 4 (2000). Following the revocation, Losh pleaded guilty and was convicted of driving while impaired, in violation of Minn.Stat. § 169A.20, subd. 1 (2000).[1]

Before trial, Losh moved to dismiss the driving after revocation charge on the ground that it was a civil/regulatory offense under Public Law 280 and, therefore, the court lacked subject-matter jurisdiction. The State conceded that driving after revocation was civil/regulatory, but it argued that the court had jurisdiction because the offense was committed on the Leech Lake Reservation and Losh is not a member of the Leech Lake Band.

The district court denied Losh's motion, concluding that the court had subject-mat-

---

1. Losh's conviction for driving while impaired would have also been a basis for revocation had his license not been revoked by the Department of Public Safety prior to the entry of judgment of conviction. *See* Minn.Stat. § 171.17, subd. 1(a)(2) (2000) (providing for revocation of driving privileges for violations of Minn.Stat. § 169A.20 (2000), which prohibited, among other things, the operation of a motor vehicle with a blood-alcohol content of 0.10 or more); Minn. R. 7503.0700, subp. 1 (2007).

ter jurisdiction. The court reasoned that it had jurisdiction under Public Law 280 on the ground that the offense occurred on the Leech Lake Reservation, but Losh is not a member of the Leech Lake Band and does not reside on the Leech Lake reservation. Thus, the court concluded that Losh should be treated as a non-member Indian for purposes of subject-matter jurisdiction.

Subsequently, the case proceeded to a court trial on stipulated facts. The parties stipulated that Losh was driving on December 14, 2005, within the boundaries of the Leech Lake Reservation, that his driving privileges were revoked for an "alcohol-related offense," and that he knew or should have known that his driving privileges were revoked. The district court found Losh guilty of driving after revocation, in violation of Minn.Stat. § 171.24, subd. 2.

The court of appeals affirmed, but on different grounds, concluding that the charged offense was criminal/prohibitory under existing case law interpreting Public Law 280 and, therefore, the court had subject-matter jurisdiction. *Losh,* 739 N.W.2d at 735–36. The court of appeals reasoned that because Losh's driver's license was revoked for driving while impaired, that his driving after revocation offense raised "heightened public policy concerns" justifying state jurisdiction. *Id.* at 735. We granted Losh's petition for further review.

### I.

■■■ Losh argues that the court lacks subject-matter jurisdiction under Public Law 280. Subject-matter jurisdiction is a court's power to hear and determine cases that are presented to the court. *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006); *State v. Simion,* 745 N.W.2d 830, 836–37 (Minn. 2008). Whether the court has jurisdiction is an issue we review de novo. *State v. Busse,* 644 N.W.2d 79, 82 (Minn.2002).

■■■ Indian tribes retain " 'attributes of sovereignty over both their members and their territory,' " and " 'tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States.' " *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 207, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) (quoting *United States v. Mazurie,* 419 U.S. 544, 557, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975), and *Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 154, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980)). But "state laws may be applied to tribal Indians on their reservations if Congress has expressly so provided [for it]." *Id.* Public Law 280 "expressly granted six states, including [Minnesota,] jurisdiction over specified areas of Indian country within the states." 18 U.S.C. § 1162 (2000); 25 U.S.C. §§ 1321–24 (2000); 28 U.S.C. § 1360 (2000); *Cabazon,* 480 U.S. at 207, 107 S.Ct. 1083 (1987). In section 2(a) of Public Law 280, Minnesota was granted broad criminal jurisdiction over offenses committed by or against Indians, within "Indian country,"[2] except for offenses committed within the Red Lake Reservation and the Bois Forte Reservation at Nett Lake. *See Cabazon,* 480 U.S. at 207, 107 S.Ct. 1083.

In *Cabazon,* the Supreme Court explained that "when a [s]tate seeks to enforce a law within an Indian reservation

---

**2.** The term "Indian country," as defined in 18 U.S.C. § 1151 (2000), includes "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation." *Cabazon,* 480 U.S. at 207 n. 5, 107 S.Ct. 1083.

under the authority of Pub.L. 280, it must be determined whether the law is criminal in nature, and thus fully applicable to the reservation under § 2, or civil in nature, and applicable only as it may be relevant to private civil litigation in state court." 480 U.S. at 208, 107 S.Ct. 1083. The Court observed that the criminal/civil dichotomy is not a "bright-line rule," *id.* at 210, 107 S.Ct. 1083, and that "applicable state laws governing an activity must be examined in detail before they can be characterized as regulatory or prohibitory," *id.* at 211 n. 10, 107 S.Ct. 1083. The Court stated that:

> [I]f the intent of a state law is generally to prohibit certain conduct, it falls within Pub.L. 280's grant of criminal jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub.L. 280 does not authorize its enforcement on an Indian reservation. The shorthand test is whether the conduct at issue violates the State's public policy.

*Id.* at 209, 107 S.Ct. 1083.

At issue in *Cabazon* was whether California had the authority to enforce gambling laws against the playing of bingo, draw poker, and other card games on Indian reservation land. *Id.* at 205–06, 107 S.Ct. 1083. The Supreme Court concluded that because "California permits a substantial amount of gambling activity, including bingo, and actually promotes gambling through its state lottery, California regulates rather than prohibits gambling in general and bingo in particular" and, therefore, the law at issue was civil/regulatory. *Id.* at 211, 107 S.Ct. 1083.

In *State v. Stone*, 572 N.W.2d 725 (Minn. 1997), we considered whether the State had jurisdiction to enforce certain traffic and driving-related laws against members of the White Earth Band for conduct on the reservation. *Id.* at 727. Based on the conclusion in *Cabazon* that the criminal/prohibitory and civil/regulatory dichotomy is not a bright-line rule, but rather requires a detailed examination of the applicable state law, we adopted a two-step approach to apply the *Cabazon* test. *Id.* at 729–30. The first step is to determine whether the focus of the analysis should be on the broad conduct involved—driving, or the narrow conduct—violations of the "driving regulations at hand." *Id.* at 730. We concluded that "[t]he broad conduct will be the focus of the test *unless* the narrow conduct presents substantially different or heightened public policy concerns. If this is the case, the narrow conduct must be analyzed apart from the broad conduct." *Id.* The second step is to apply the focus of the *Cabazon* analysis. Specifically, "[i]f the conduct is generally permitted, subject to exceptions, then the law is civil/regulatory," but "[i]f the conduct is generally prohibited, the law is criminal/prohibitory." *Id.*

With respect to the second step, we noted in *Stone* that "in close cases" we are "aided by *Cabazon's* 'short-hand public policy test,'" that conduct is "criminal if it violates the state's 'public [*criminal*] policy.'" 572 N.W.2d at 730. To determine whether an activity violates the state's public criminal policy, the following nonexclusive factors are useful:

> (1) the extent to which the activity directly threatens physical harm to persons or property or invades the rights of others; (2) the extent to which the law allows for exceptions and exemptions; (3) the blameworthiness of the actor; (4) the nature and severity of the potential penalties for a violation of the law.

*Id.; see also State v. Robinson*, 572 N.W.2d 720, 724 (Minn.1997) (applying the four, nonexclusive factors identified in *Stone* in the second step of the *Cabazon* analysis to help determine whether a stat-

ute was criminal/prohibitory or civil/regulatory); *State v. Jones,* 729 N.W.2d 1, 5–6 (Minn.2007) (plurality opinion) (finding that *Cabazon's* "shorthand public policy test" may be used to help determine if particular conduct is criminal/prohibitory or civil/regulatory and that the four, non-exclusive factors identified in *Stone* can be utilized to help determine whether an activity is criminal/prohibitory).

We then concluded that the traffic and driving laws in question, including failure to provide proof of insurance, did not raise policy concerns that were substantially different or heightened from the general public policy behind driving laws in general and, therefore, were properly analyzed as part of the broad conduct of driving. *Stone,* 572 N.W.2d at 731. We determined that the driving laws in question were civil/regulatory and that the State lacked jurisdiction under Public Law 280.[3] *Id.*

Two years later, in *State v. Johnson,* 598 N.W.2d 680 (Minn.1999), we reaffirmed our holding in *Stone* that failure to provide proof of insurance is a civil/regulatory traffic violation, and that the State lacked jurisdiction to enforce the law against tribal members on tribal land. 598 N.W.2d at 683. We further held that driving after revocation in violation of Minn.Stat. § 171.24, subd. 2, is a civil/regulatory traffic violation as to which the court has no jurisdiction when committed by tribal members on tribal land. *Johnson,* 598 N.W.2d at 684.

In *Busse* we considered whether the State had jurisdiction to prosecute Busse, who was a member of the White Earth Band, for driving after cancellation as inimical to public safety, in violation of Minn. Stat. § 171.24, subd. 5 (1998), when the offense occurred on his reservation. 644 N.W.2d at 80. We determined that under *Cabazon* "[t]he applicable state laws ... must be examined in detail before they can be categorized as regulatory or prohibitory." *Busse,* 644 N.W.2d at 83 (internal quotation marks omitted). Relying on *Stone,* we first considered whether the proper focus under *Cabazon* was on the broad conduct of driving or the narrow conduct of the driving regulation violations at hand. *Busse,* 644 N.W.2d at 83. To determine the proper focus under *Stone* and achieve the detailed examination of applicable state law, we concluded that it was reasonable to consider the underlying basis for the cancellation of Busse's driving privileges, that is, his convictions for driving while impaired.[4] *Busse,* 644 N.W.2d at 84. We concluded that driving after cancellation as inimical to public safety, in violation of Minn.Stat. § 171.24, subd. 5, "presents substantially different or heightened public policy concerns [rather than driving in general]." *Busse,* 644 N.W.2d at 88. Thus, we focused on the narrow conduct of the specific offense of driving after cancellation as inimical to public safety, as well as Busse's underlying conduct of driving while impaired, and concluded that the specific offense was criminal/prohibitory. *Id.*

Losh argues that this court's holding in *Johnson* that Minn.Stat. § 171.24, subd. 2, is civil/regulatory under *Cabazon* is dispos-

---

3. We decided *State v. Robinson,* 572 N.W.2d 720 (Minn.1997), the same day as *Stone.* Following *Stone,* we held that the statute governing underage consumption of alcohol is criminal/prohibitory, but that the statute governing failure to yield to an emergency vehicle is civil/regulatory under *Cabazon. Robinson,* 572 N.W.2d at 724.

4. Busse's license was cancelled as inimical to public safety under Minn.Stat. § 171.04, subd. 1(9) (1998). *Busse,* 644 N.W.2d at 80. It was cancelled as inimical to public safety because Busse had four prior driving-while-impaired convictions. *Id.* at 81.

itive. Thus, he argues that the court of appeals' conclusion that driving after revocation under Minn.Stat. § 171.24, subd. 2, is criminal/prohibitory is wrong and must be reversed. Losh is correct that in *Johnson* we held that "driving after revocation in violation of Minn.Stat. § 171.24, subd. 2, is ... a civil/regulatory traffic violation as to which the court has no jurisdiction when committed by tribal members on tribal land." 598 N.W.2d at 684.

The issue before the court in *Johnson,* however, was whether driving after revocation for "failure to provide proof of insurance in violation of Minn.Stat. § 169.791" was criminal/prohibitory or civil/regulatory under *Cabazon/Stone. Johnson,* 598 N.W.2d at 681. The issue before us in this case is whether driving after revocation for driving while impaired, in violation of Minn.Stat. § 169A.20, subd. 1 (2000), is criminal/prohibitory or civil/regulatory. Because this issue was not before us in *Johnson, Johnson* it is not dispositive. *See Nadeau v. Melin,* 260 Minn. 369, 375, 110 N.W.2d 29, 34 (1961) ("A decision must be construed in the light of the issue before the court."); *Fletcher v. Scott,* 201 Minn. 609, 613, 277 N.W. 270, 272 (1938) ("The rule of stare decisis is never properly invoked unless in the decision put forward as precedent the judicial mind has been applied to and passed upon the precise question."); *accord Illinois v. Lidster,* 540 U.S. 419, 424, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004) (indicating that "general language in judicial opinions" must be read "as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering").

Further, we stated in *Stone,* without expressly holding, that driving while intoxicated, a misdemeanor, reflects heightened public policy concerns. 572 N.W.2d at 731;

*see also Busse,* 644 N.W.2d at 85 n. 6 (citing *Stone* ). Thus, this court explicitly left unresolved the question of whether a drinking and driving offense, which was the reason underlying the revocation, presents heightened public policy concerns not present in the offense of failure to provide proof of insurance.

In *Busse,* we clarified and limited our holding in *Johnson.* We stated that "the revocation in *Johnson* was based on failure to provide proof of insurance, and it followed from *Stone* that driving after revocation *on that basis* was also civil/regulatory." *Busse,* 644 N.W.2d at 87 (emphasis added). Further, we limited our holdings in *Stone* and *Johnson* so that "different cases with different facts being applied to different statutes could be separately analyzed and decided on their respective merits." *Busse,* 644 N.W.2d at 87 n. 13. Specifically, we stated that "[a]s in *Johnson,* we leave the door open to situations in which the reason underlying the cancellation presents different concerns than are before us in this case." *Busse,* 644 N.W.2d at 86 n. 9.

■ More importantly, we concluded in *Busse* that under *Cabazon/Stone,* it is permissible to consider the underlying offense that resulted in the cancellation in order to determine whether the proper focus should be on the broad conduct of driving, or the narrow conduct of the driving regulation violations at issue. *Busse,* 644 N.W.2d at 84. In doing so, we specifically rejected the argument that under *Johnson* it was improper to consider the underlying offense that led to a license revocation to determine the focus under *Stone. Busse,* 644 N.W.2d at 84. We concluded that

in *Johnson* we did not hold that a court could not look at the basis for a license revocation. Using decidedly tentative language, we simply raised the question whether the issue *might* arise *whether*

fairness precludes considering the underlying offense because the offender *could* be subject to being sanctioned twice for the prior offense.

*Busse,* 644 N.W.2d at 84.

Losh contends that limiting the holding of *Johnson* to its particular facts, which is driving after revocation based on the failure to provide proof of insurance, will result in endless disputes and uncertainty. Losh is correct that there are many grounds for revocation of driving privileges.[5] But *Cabazon* requires that we examine the relevant statute in detail to determine whether it is criminal/prohibitory or civil/regulatory. 480 U.S. at 211 n. 10, 107 S.Ct. 1083 ("The applicable state laws ... must be examined in detail before they can be characterized as regulatory or prohibitory."). Because the legislature's concerns in prohibiting driving after a revocation for some grounds, such as criminal vehicular homicide or injury,[6] are likely different than driving after revocation for failure to provide proof of insurance,[7] it is necessary to consider the underlying basis for the revocation. *See Stone,* 572 N.W.2d at 731 (indicating that revocation based on failure to provide proof of insurance is based on concern for economic reparation rather than safety); *see also Busse,* 644 N.W.2d at 87 (comparing legislature's concerns in combating driving while impaired by prohibiting driving after cancellation for driving while impaired with concern in prohibiting driving after revocation for failure to provide proof of insurance).

Because *Johnson* did not consider whether driving after revocation as a result of driving while impaired was criminal/prohibitory or civil/regulatory, we hold that *Johnson* is factually distinguishable. But we affirm our holding in *Johnson* that Minn.Stat. § 171.24, subd. 2, is civil/regulatory under *Cabazon/Stone* when a tribal member is charged with driving after revocation and his or her license was revoked for failure to provide proof of insurance. *Johnson,* 598 N.W.2d at 684.

Second, we hold that it is permissible under *Cabazon/Stone* for a court to consider the underlying basis for the revocation to determine the proper focus and, in particular, whether the narrow conduct, that is, the specific offense and the underlying offense that caused the license revocation, raises substantially different or heightened public policy concerns. *Busse,* 644 N.W.2d at 84–85. Losh presents no compelling

---

5. Failure to provide proof of insurance is grounds for revocation of a driver's license. Minn.Stat. § 169.792 (2006). A person's driver's license must be revoked for failure to submit to a chemical test for alcohol concentration when an officer has probable cause to believe that a person operated a vehicle in violation of Minn.Stat. § 169A.20 (2006). Minn.Stat. § 169A.52(3)(b) (2006). Criminal negligence in the operation of a motor vehicle that causes the death of another is also grounds for revocation. Minn.Stat. § 169.11 (2006).

   Minn.Stat. § 171.17, subd. 1 (2006), sets forth the following grounds for revocation: (1) criminal vehicular homicide or injury; (2) driving while impaired or fleeing a peace officer; (3) using a motor vehicle in the commission of a felony; (4) failure to stop, give identity, and render aid following an accident involving death or injury of another; (5) perjury or the making of false statements to the Department of Public Safety relating to ownership or operation of a motor vehicle; (6) three charges of violating any of the provisions of chapter 169 within a period of 12 months; (7) failing to stop, under certain conditions, for a school bus two or more times within five years; (8) passing or attempting to pass a school bus under circumstances where a driver is required to yield; (9) offenses in other states that would be grounds for revocation if committed in Minnesota; and (10) violating a speed limit by driving in excess of 100 miles per hour.

6. Minn.Stat. § 171.17, subd. 1(a)(1) (2006).

7. Minn.Stat. § 169.791, subd. 6 (2006).

reason why we should not consider the underlying basis for the revocation in this case. We observe, however, that a detailed analysis of the regulations at issue under *Cabazon/Stone* requires that a court consider both the broad and the narrow conduct before determining the proper focus.

## II.

■ Having concluded that *Johnson* is not dispositive, we apply the two-step *Cabazon/Stone* test to determine whether the driving conduct at issue is criminal/prohibitory or civil/regulatory. In doing so, the applicable state laws must be examined in detail before they can be categorized. Under *Cabazon/Stone*, the first step requires that we determine whether the proper focus is on the broad conduct of driving, or the narrow conduct of the specific offense at issue. The question for determination is whether the narrow conduct of driving after revocation, as a result of driving while impaired,[8] raises substantially different or heightened public policy concerns as compared to traffic and driving laws in general.

In *Stone*, we stated that the public policy prohibiting driving while impaired involved heightened public policy concerns "in that their violation creates a greater risk of direct injury to persons and property on the roadway." 572 N.W.2d at 731. The legislature has concluded that a person who commits the offense of driving while impaired poses a continuing threat with regard to public safety on Minnesota roads, and it has authorized the Department of Public Safety to immediately revoke the license of a driver convicted of such an offense. Minn.Stat. § 171.17

(2006); *Stone*, 572 N.W.2d at 731. The legislature has also provided that a revocation of an individual's driving privileges is mandatory upon failing a chemical test under the implied-consent laws. Minn. Stat. § 169A.52, subd. 4 (2006); *see also* Minn. R. 7503.0700, subp. 2 (2007) (requiring revocation upon violation of implied-consent laws).

Clearly, revocation of driving privileges for driving while impaired is part of a larger, overall strategy of the legislature to protect the public from individuals who, due to their drug and alcohol use, pose a safety threat to others when driving on Minnesota roads. This overall strategy distinguishes the regulations at issue from general traffic and driving regulations, in that their violation creates a greater risk of direct injury to persons and property. The policy of protecting the public from drunk drivers is implicated when a person who has had his or her driving privileges revoked for driving while impaired continues to drive. Consequently, we conclude that the narrow conduct of driving after revocation, as a result of driving while impaired, raises substantially different or heightened public policy concerns as compared to the traffic and driving laws in general. Thus, the proper focus under *Cabazon/Stone* is the narrow conduct of driving after revocation as a result of driving while impaired.

The second step under *Cabazon/Stone* requires that we next determine whether the narrow driving conduct at issue is criminal/prohibitory or civil/regulatory. Minnesota law mandates the revocation of a driver's license for a driving-while-impaired offense, and a person with a revoked license is prohibited from driving.

---

**8.** By driving after revocation, as a result of driving while impaired, we refer to situations when a license was revoked following either a conviction for driving while impaired, in violation of Minn.Stat. § 169A.20, subd. 1, or a failure of a test administered under the implied-consent law pursuant to Minn.Stat. § 169A.52, subd. 4.

Minn.Stat. §§ 169A.52, subd. 4, 169A.55, subd. 2 (2006), 171.17 & 171.24, subd. 2.

Minnesota law does set forth a procedure for a driver with a revoked license to apply for a limited license that would allow him or her to drive to certain places during specified hours of the day. Minn.Stat. § 171.30 (2006). But the statute only provides that the Commissioner of Public Safety may issue a limited license after a revocation when the specific conditions of the statute showing a hardship are satisfied. Minn.Stat. § 171.30, subd. 1(a) (2006); Minn. R. 7503.1800, subp. 2 (2006) ("The commissioner shall issue a limited license to a person *only when* the person complies with the waiting period and conditions specified in this part, part 7409.3600, and Minnesota Statutes, section 171.30." (emphasis added)). While this could be considered an "exception," it does not favor Losh because it is limited in nature, and Losh did not apply for and does not possess such a license. Because the narrow conduct of driving after revocation based on an underlying offense of driving while impaired is "generally prohibited" and not "generally permitted, sub-

ject to exceptions," we conclude that it is criminal/prohibitory. *See Stone*, 572 N.W.2d at 730.

We do not believe this is a close case that warrants application of *Cabazon's* shorthand public policy test for determining whether conduct is criminal/prohibitory or civil/regulatory. We note, however, that application of the four *Stone* factors supports our conclusion that driving after revocation when the underlying basis of the revocation is driving while impaired is criminal/prohibitory.[9]

We hold that for the purposes of determining whether the State has subject-matter jurisdiction, pursuant to Public Law 280, to prosecute a tribal member who commits the offense of driving after revocation of a driver's license, in violation of Minn.Stat. § 171.24, subd. 2, on tribal land because that offense is criminal/prohibitory, a court may consider the underlying basis for the revocation to determine whether the driving after revocation offense raises substantially different or heightened public policy concerns. We further hold that driving after revocation

9. The conduct at issue directly threatens physical harm to persons or property or invades the rights of others. *See Stone*, 572 N.W.2d at 730. By having a license revoked for driving while impaired, a driver has already shown that his or her driving poses a danger to others. Further, in order to obtain a new license after it has been revoked, a person has to retake the written and road tests required to obtain a driver's license, thereby demonstrating his or her safe driving skills. *See* Minn.Stat. § 171.29 (2006). A person who has not done this, yet continues to drive, directly threatens physical harm to others. The heightened public criminal policy of protecting the public from drunk driving is implicated when a person drives after revocation based on an underlying offense of driving while impaired. Second, we have already noted that there is only a limited, narrow exception to driving after revocation based on applying for and being granted a limited li-

cense. Third, Losh is clearly blameworthy. *See Stone*, 572 N.W.2d at 730. His license was revoked in 2000, and he has not sought a limited license, nor has he taken the necessary steps to have a new license issued to him. Driving after revocation and failing to have his driving privileges reinstated during a period of five years indicates a lack of respect for Minnesota's driving laws. It also demonstrates a lack of concern for the safety of others. The fourth factor is the nature and severity of the potential penalties for a violation of the law. *Stone*, 572 N.W.2d at 730. Driving after revocation is a misdemeanor, which is still a criminal offense under Minnesota law that is punishable with jail time. Minn.Stat. § 171.24, subd. 2. These factors, when viewed as a whole, indicate that driving after revocation when the underlying offense was driving while impaired violates the state's criminal public policy.

in violation of Minn.Stat. § 171.24, subd. 2, when the underlying basis for the revocation was driving while impaired, based on a violation of Minn.Stat. § 169A.20, subd. 1, or a failure of a test administered under the implied-consent law pursuant to Minn. Stat. § 169A.52, subd. 4, is criminal/prohibitory for purposes of determining jurisdiction under Public Law 280. Therefore, we conclude that the State has subject-matter jurisdiction to enforce the driving after revocation statute against Losh.[10]

Affirmed.

Dissenting, MEYER and PAGE, JJ.

MAGNUSON, C.J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

MEYER, Justice (dissenting).

### DISSENT

I respectfully dissent. The majority today effectively overrules this court's recent precedent in *State v. Johnson,* 598 N.W.2d 680 (Minn.1999). We held in *Johnson* that driving after revocation in violation of Minn.Stat. § 171.24, subd. 2 (2006), is a "civil/regulatory traffic violation as to which the court has no jurisdiction when committed by tribal members on tribal land." *Johnson,* 598 N.W.2d at 684. I would follow this holding and conclude that Losh's driving after revocation offense was civil/regulatory, rather than criminal/prohibitory.[1]

Under the authority of Public Law 280 and the United States Supreme Court's decision in *California v. Cabazon Band of Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), only criminal laws can be enforced against tribal members on tribal land. *See State v. Stone,* 572 N.W.2d 725, 728–31 (Minn.1997). In *Stone* this court laid out a two-step approach for distinguishing between criminal and civil/regulatory state laws, based on the intent of the law. *Id.* at 730. First, a court must determine the focus of the analysis: the broad conduct will be the focus unless the narrow conduct presents "substantially different or heightened public policy concerns," in which case the narrow conduct will be analyzed. *Id.* The second step is to apply the *Cabazon* test: if the conduct is generally permitted, subject to exceptions, the law is civil/regulatory, whereas if the conduct is generally prohibited, the law is criminal/prohibitory. *Id.* In close cases, the "shorthand public policy test" provides that the law is criminal/prohibitory if the conduct violates the state's public criminal policy, which "seeks to protect society from serious breaches in the social fabric which threaten grave harm to persons or property." *Id.*

In *Johnson,* this court was called upon to determine the status of the requirement in Minn.Stat. § 169.791 (2006) that a driver produce proof of insurance, and of the prohibition in Minn.Stat. § 171.24, subd. 2 (2006), of driving after revocation of a driv-

---

10. Because we conclude that Public Law 280 expressly grants the State subject-matter jurisdiction over Losh's criminal/prohibitory offense, we do not reach the parties' arguments regarding whether "exceptional circumstances" justify state jurisdiction, or whether the State has subject-matter jurisdiction to prosecute the member of a tribal consortium, such as the MCT, for offenses committed on the reservation of another band within that consortium.

1. This would require a further decision as to whether state courts may nevertheless exert subject matter jurisdiction because Losh is not a member of the Leech Lake Band on whose reservation he was stopped, or because "exceptional circumstances" call for it. (Losh is a member of the Mille Lacs Band of the Minnesota Chippewa Tribe, which also includes the Leech Lake Band.)

er's license. 598 N.W.2d at 681. One of the two tribal members whose cases were consolidated in *Johnson* had her driver's license revoked for failure to provide proof of insurance, and the other was cited for failure to produce proof of insurance after a minor traffic accident. *Id.* at 681–82. Applying *Stone*, this court considered the two laws separately, and concluded that both were civil/regulatory. *Id.* at 683–84. We declined to consider the offense that led to revocation, as it carried its own sanction. *Id.* at 684. We noted that in *Stone* we had held that driving without a valid license raised no policy concerns that were substantially different from the general policy concern for public safety. We concluded in *Johnson* that it would be inconsistent to find "heightened public policy" concerns for driving after revocation inasmuch as a tribal member is not required to have a driver's license at all to drive on the reservation. *Id.* We thus held that "driving after revocation in violation of Minn.Stat. § 171.24, subd. 2, is … a civil/regulatory traffic violation as to which the court has no jurisdiction when committed by tribal members on tribal land." *Id.*

In this case, Losh was found guilty of the same offense as was at issue in *Johnson*, driving after revocation in violation of Minn.Stat. § 171.24, subd. 2. Our holding in *Johnson* should thus compel a holding here that the charged offense is civil/regulatory. "The doctrine of *stare decisis* directs that we adhere to former decisions in order that there might be stability in the law." *Woodhall v. State*, 738 N.W.2d 357, 363 (Minn.2007) (quoting *Oanes v. Allstate Ins. Co.*, 617 N.W.2d 401, 406 (Minn.2000)). Although we can depart from our own precedent when there are compelling reasons to do so, this case offers no such reason.

The majority attempts to distinguish *Johnson* on the basis that Losh's driving privileges were revoked under the implied-consent laws for operating a vehicle with a blood-alcohol concentration of 0.15. The majority relies on our decision in *State v. Busse*, 644 N.W.2d 79 (2002), in which we concluded in the first step of our analysis that heightened safety concerns were presented by the offense of driving after cancellation based on the driver being inimical to public safety, and at the second step that Minn.Stat. § 171.24, subd. 5 (2006), is criminal/prohibitory. Although it is true that *Busse* limits *Johnson* to some extent, *Busse* took care to distinguish *Johnson*, not to overrule it. *Busse*, 644 N.W.2d at 87. As a result, *Johnson* should still have some applicability. Under the majority's holding today, it is difficult to discern what exceedingly narrow fact pattern might be deemed appropriate for applying *Johnson's* rule.

Under the particular facts of *Busse*, we determined that we could consider at the first step of our *Stone* analysis the underlying offense that resulted in the cancellation, *Busse*, 644 N.W.2d at 84, despite our explicit concern in *Johnson* that by doing so, "the offender could be subject to being sanctioned twice for the prior offense," *Johnson*, 598 N.W.2d at 684. We did not, however, determine that considering the underlying offense was permissible in all situations. Rather, we relied on *Stone*, where we explicitly rejected the parties' opposing arguments that we adopt a single focus, for one side broad, for the other narrow, on the conduct at issue:

[A] rigid application of either approach fails to yield a workable standard. If the broad conduct of driving is analyzed without any consideration of the nature of the specific traffic statutes, then virtually any traffic or driving-related statute would be considered civil, despite serious public policy concerns the specific statute may raise. Conversely, if each

traffic statute is analyzed individually to determine if the narrow conduct is generally prohibited or permitted, practically every discrete aspect of a traffic law could be classified as criminal for the purposes of Public Law 280. Fortunately, *Cabazon* does not require this court to adopt either of these approaches.

*Stone*, 572 N.W.2d at 729–30. Clearly our precedent in *Stone* does not call for systematic adoption of the narrow focus that necessarily occurs when we consider the underlying offense. Although in *Busse* we concluded that looking at the underlying basis for the cancellation was not prohibited, we did not announce a rule requiring consideration of the underlying basis for the cancellation. Rather, we kept our focus on "whether the specific offense reflects heightened public policy concerns." *Busse*, 644 N.W.2d at 84. The specific offense in *Busse*, driving after cancellation as inimical to public safety, is "inextricably linked to multiple driving under the influence convictions," *id.* at 87, because the statute provides:

A person is guilty of a gross misdemeanor if:

(1) the person's driver's license or driving privilege has been canceled or denied under section 171.04, subdivision 1, clause (10);

(2) the person has been given notice of or reasonably should know of the cancellation or denial; and

(3) the person disobeys the order by operating in this state any motor vehicle, the operation of which requires a driver's license, while the person's license or privilege is canceled or denied.

Minn.Stat. § 171.24, subd. 5. We insisted in *Busse* on the fact that there is only one reason for which the driver's license would be canceled because allowing the person to drive would be "inimical to public safety or welfare" under section 171.04, subdivision 1, clause (10), and that reason is multiple convictions for driving under the influence:

The legislature has provided that the commissioner shall revoke the license and deny or cancel a license as inimical to public safety of a person who has either (a) three driving under the influence convictions in five years or (b) four or more convictions in a lifetime.... By rule there are only three circumstances under which licenses are canceled.... All three relate to multiple alcohol or controlled substance violations and the commissioner is not allowed any discretion in the cancellation or denial.... Thus, cancellation as inimical to public safety necessarily requires multiple driving under the influence convictions.

*Busse*, 644 N.W.2d at 83–84 (citations omitted). We insisted several more times on the fact that the underlying offense was necessarily included in the offense of driving after cancellation as inimical to public safety. *Id.* at 85–87. The difference between *Busse*, where we considered the underlying offense, and *Johnson*, where we did not, lies in the fact that in *Busse* the statute included a reference to the reason for which the driver's license was cancelled.

The concern we expressed in *Stone* that a narrow focus would always lead to finding a statute to be criminal/prohibitory comes to pass with the majority's decision today. The majority's approach will result in precisely the rigidity we rejected in *Stone*, as any offense leading to revocation or cancellation may, depending on the views of the individual judges sitting on this court, seem to raise heightened public safety concerns. Under today's holding, I have no doubt that the fact pattern in *Johnson* will tomorrow lead to a conclusion that driving after revocation for failure to produce proof of insurance is criminal/pro-

hibitory because the underlying offense of failing to comply with the requirement to carry proof of insurance raises heightened public policy concerns.

I would not overrule *Johnson's* holding that Minn.Stat. § 171.24, subd. 2, is civil/regulatory, and I would therefore conclude the State does not have jurisdiction over Losh's offense. The issue remains whether the State has jurisdiction to enforce the offense when it is committed by an enrolled member of one band of the Minnesota Chippewa Tribe but on the reservation of a different band of that tribe. The district court ruled in the affirmative, but the court of appeals never addressed the issue. I would reverse and remand to the court of appeals to give that court an opportunity to rule on this issue.

PAGE, Justice (dissenting).

I join in the dissent of Justice Meyer.